**Mary Ellen STROTHER and Harold David Strother, natural guardians of Harold David Strother, Jr., a minor child, Petitioners,**

v.

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 88–32 V.

United States Claims Court.

Nov. 17, 1989.

OPINION AND ORDER[1]

RADER, Judge.

In this action under the National Childhood Vaccine Injury Act of 1986, codified as amended at 42 U.S.C. §§ 300aa–1 (Supp. V 1987) (the Act), petitioners seek compensation for injuries to Harold David Strother (David). On August 9, 1984, Dr. Charles Benton, administered a measles vaccine to David. On August 11, 13, 15, and again on August 17, Mrs. Strother brought David back to Dr. Benton with a fever, an ear infection, a rash, and other maladies. When Mrs. Strother brought David back for still more treatment on August 20, Dr. Benton purportedly told her that her son had contracted measles from the vaccine.

Mrs. Strother testified that David remained sick into September 1984. As he recovered, according to Mrs. Strother, David became listless. Hyperactivity and irritability followed the period of listlessness. Dr. Benton saw David again on January 2, 1985 and on four more occasions in January. He observed none of these symptoms of hyperactivity and irritability until David's next visit on July 11, 1985.

David also received treatment from Dr. John Axley, a neurologist. On March 4, 1986, Dr. Axley examined David. On March 26, 1986, David underwent a CT scan on his head and an electroencephalogram (EEG). Neither test revealed significant abnormality.

In March 1987, David suffered a generalized seizure. On February 10, 1988, David had a second EEG. This EEG disclosed abnormalities consistent "with a generalized encephalopathic process...." Transcript of Proceedings, No. 88–32V, filed August 23, 1989 (Tr.), Ex. 3–A, at 18. In other neuropsychological evaluations performed at that time, David displayed communicative, social, and academic abilities well behind his chronological age. Tr., Ex. 3–A, at 15–17.

Gregory P. Farrar, Pensacola, Fla., for petitioners.

Barbara Hudson, Rockville, Md., with whom were Stuart E. Schiffer, Acting Asst. Atty. Gen., and John Lodge Euler, Deputy Director.

1. This opinion and order may contain information that may not be disclosed to a non-party. *See* 42 U.S.C. § 300aa–12(c)(2) (Supp. V 1987). Accordingly, within fourteen days after the date of this opinion and order, the parties shall designate any material subject to § 300aa–12 and such designated material will be deleted for public access. If on review of this report, there are no objections filed within the fourteen day period, then it shall be deemed that there is no material subject to § 300aa–12.

On October 17, 1988, petitioners filed a claim with the United States Claims Court for compensation under the Act. Respondent, after filing an answer contesting petitioners' entitlement under the Act, withdrew from the case on May 26, 1989. On August 10, 1989, the Special Master held a hearing to take evidence from seven witnesses for the petitioners. Respondent, consistent with its notice of withdrawal, did not appear at the hearing.

On September 18, 1989, the Special Master filed a Report and Recommended Decision (Report). The Report recommended an award to David of $1,331,041.00 for future medical and rehabilitative expenses, $334,328.00 for lost earnings, $150,000.00 for pain and suffering, and $12,890.95 for attorney fees and costs.

Respondent filed an Objection to Report and Recommendation for Judgment (Objection) on October 10, 1989. Respondent contended that petitioners had not shown that the vaccine in fact caused David's injury. Respondent also challenged the Report's recommended award for pain and suffering, lost earnings, attorney fees, and costs in excess of the $30,000.00 cap in 42 U.S.C. § 300aa–15(b). Finally, respondent faulted the Report for failure to reduce the compensation to account for any payments David might receive from state or federal health benefit programs.

On November 3, 1989, this court held an oral argument. Petitioners objected to the recommended award in the Report. Petitioners argued for enhancement of the recommended award for future medical and rehabilitative expenses to account for around-the-clock home health care and to account for a normal life span for David. Petitioners further contend that the Report erred in finding that David's medical insurance covers dental work. Petitioners also protested the Report's limitations on attorney fees and costs.

Based on the entire record of this case to date, this court remands to the Special Master. The Special Master shall take into account this court's opinion in issuing another Report and Recommended Judgment.

### Discussion

Respondent objects to the Report on three grounds: insufficient proof of causation in fact, improper application of the $30,000.00 cap, and incorrect accounting for David's eligibility for State or Federal compensation programs. Petitioners likewise set forth objections to the Report. In order to facilitate reconsideration by the Special Master under compressed time limits, this court provides rulings and instructions on several of these outstanding issues.

### Table Injury

The Act authorizes compensation "to a petitioner if the court finds on the record as a whole—

(A) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa–11(c)(1) of this title, and

(B) that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death ... is due to factors unrelated to the administration of the vaccine...."

42 U.S.C. § 300aa–13(a)(1). Petitioners bear the burden of proving the factors stated in § 300aa–11(c)(1). Section 300aa–11(c)(1) requires, in principal part, that petitioners show either that they "sustained ... [an] injury or condition set forth in the Vaccine Injury Table" or that they "sustained ... [an] injury, or condition not set forth in the Vaccine Injury Table but which was caused by a vaccine...." 42 U.S.C. § 300aa–11(c)(1)(C)(ii)(I). Thus, petitioners must show by a preponderance of the evidence either that they sustained a Table injury or that the vaccine in fact caused their injury.

To show a Table injury, petitioners must prove two elements. First, petitioners must show that they sustained an injury— e.g., encephalitis, anaphylaxis, residual seizure disorder—listed on the Table in § 300aa–14. Second, petitioners must show that they suffered the first symptoms of this injury within the time limits listed on the Table. Thus, the Vaccine Injury Table sets forth a list of vaccines, potential

injuries, and time frames for initial manifestation of the injury. If an individual received a listed vaccine and sustained a listed injury within a listed time period, the injury is presumed compensable.[2]

The Vaccine Table, in effect, determines by law that the temporal association of certain injuries with the vaccination will constitute sufficient proof that the vaccine caused the harm. The Table replaces traditional tort standards of causation in fact with a causation in law based on temporal association. The House Committee on Energy and Commerce explained the merits of this approach:

> The Committee recognizes that there is public debate over the incidence of illnesses that coincidentally occur within a short time of vaccination. The Committee further recognizes that the deeming of vaccine-relatedness adopted here may provide compensation to some children whose illness is not, in fact, vaccine-related. The Committee anticipates that the research on vaccine injury and vaccine safety now ongoing and mandated by this legislation will soon provide more definitive information about the incidence of vaccine injury and that, when such information is available, the Secretary or the Advisory Commission on Childhood Vaccines (discussed below in Section 2119) may propose to revise the Table, as provided below in Section 2114. Until such time, however, the Committee has chosen to provide compensation to all persons whose injuries meet the requirements of the petition and the Table and whose injuries cannot be demonstrated to be caused by other factors.

H.R.Rep. No. 99–908, 99th Cong., 2d Sess., pt. 1, at 18 (1986). Thus, the Act provides in the Table standards for causation at law based on proximate temporal relationship between the vaccination and the onset of certain injuries.

In the case at bar, the Report stated:

> No symptoms of an encephalopathy or seizure disorder occurred within the first fifteen days following the administration of the vaccine.

Report, at 13. The evidence amply supports this proposed finding. Dr. Benton, David's treating physician, saw David numerous times in the two week period following the vaccination, yet he observed no symptoms of encephalopathy or seizures. Tr., at 32; Ex. 1, at 3. A CT scan and an EEG performed on March 26, 1986—more than 19 months after the vaccination—revealed no abnormalities. Notice of Additional and Supplemental Medical Records, No. 88–32V, filed Feb. 7, 1989 (Notice), at Section IX, pp. 4–5. Dr. John Axley—who performed the initial CT and EEG tests, performed neurological exams, and otherwise treated David—did not diagnose encephalitis or seizure disorders. *Id.* at 1–5. These factors are only a sampling of the evidence showing that David did not display symptoms of a Table injury within the prescribed Table time limits.

### *Causation in Fact*

The Act, in addition to providing compensation for injuries meeting the Table's legal standards for causation, also compensates individuals who can show that a vaccine in fact caused their injury. The traditional causation in fact standard governs vaccine tort cases in state and federal courts out-

---

**2.** The Act also appears to presume that, in the absence of proof of another cause, the vaccine caused the encephalopathy. 42 U.S.C. § 300aa–14(b)(3)(B). This presumption appears to override the temporal relationship requirements of the Table. Thus, the Table in § 300aa–14 appears to conflict with the provisions of § 300aa–14(b)(3)(B). This court seeks additional clarification of this apparent ambiguity by examining the Act's legislative history. The House Report explains:

> [T]he subsection also restates in specific terms the general rule described in Section 2113 and provides that if the cause of an

encephalopathy is an infection or another condition not related to the vaccine, the encephalopathy is not to be considered compensable. If, however, the court if unable to determine the cause of an encephalopathy, the encephalopathy is to be considered compensable if other conditions (including specified time of initial onset) are met.

H.R.Rep. No. 99–908, 99th Cong., 2d Sess., pt. 1, at 19 (1986). Thus, this presumption in § 300aa–14 merely restates specifically the requirements of the Table, including time limits for the onset of the injury.

side the Act. *See, e.g., Alvarez v. United States,* 495 F.Supp. 1188, 1206 (D.Col.1980). These other state and federal vaccine tort cases are not subject to the compensation limits of the Act.

■ Temporal association alone establishes legal causation for a Table injury. Temporal association of the onset of injury with the vaccination is not sufficient, however, to establish causation in fact. *Hasler v. United States,* 718 F.2d 202, 205 (6th Cir.1983). A Court of Appeals ruling clarifies:

> [T]he inoculation is not the cause of every event that occurs within the ten day period.... Without more, this proximate temporal relationship will not support a finding of causation.

*Hasler,* 718 F.2d at 205. When a petitioner relies upon proof of causation in fact rather than proof of a Table injury, a proximate temporal association alone does not suffice to show a causal link between the vaccination and the injury. To prove causation in fact, petitioners must show a medical theory causally connecting the vaccination and the injury. *Hasler,* 718 F.2d at 205–06.

The statute distinguishes Table injuries from injuries caused in fact by the vaccine. Section 300aa–11(c)(1)(C)(i) discusses Table injuries. Section 300aa–11(c)(1)(C)(ii) discusses two forms of injury requiring proof of causation in fact. Subparagraph (I) discusses injuries "not set forth in the Vaccine Injury Table but which [were] caused by a vaccine...." Sub-paragraph (II) discusses injuries "set forth in the Vaccine Injury Table the first symptom or manifestation ... of which did not occur within the time period set forth in the Table but which [were] caused by a vaccine...." The statute thus distinguishes between proof of a Table injury and proof of causation in fact.

This distinction in statutory language underscores the differences in proof required for Table injuries as compared to injuries caused in fact by the vaccine. Causation in fact requires proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury. A reputable medical or scientific explanation must support this logical sequence of cause and effect. *Hasler,* 718 F.2d at 205–06; 42 U.S.C. § 300aa–13(a)(1). Temporal association between petitioner's injury and the vaccination alone does not prove causation in fact. Moreover, similarity of petitioner's injury to injuries listed on the Table does not show causation in fact. Encephalitis, seizure disorders, and other Table injuries can have causes other than administration of a vaccine.

The Act's legislative history explains further the distinction between a Table injury and causation in fact. The House Committee on Energy and Commerce stated:

> If the petitioner sustained or had significantly aggravated an injury not listed in the Table, he or she may petition for compensation. If the petitioner sustained or had significantly aggravated an injury listed in the Table but not within the time period set forth in the Table, he or she may petition for compensation. In both of these cases, however, the petition must affirmatively demonstrate that the injury or aggravation was caused by the vaccine. Simple similarity to conditions or time periods listed in the Table is not sufficient evidence of causation; evidence in the form of scientific studies or expert medical testimony is necessary to demonstrate causation for such a petitioner. (Such a finding of causation is deemed to exist for those injuries listed in the Table which occur within the time period set forth in the Table.)

H.R.Rep. No. 99–908, 99th Cong., 2d Sess., pt. 1, at 15 (1986). The Act relaxes proof of causation for injuries satisfying the Table in § 300aa–14, but does not relax proof of causation in fact.

In the case at bar, the record does not contain sufficient evidence to show causation in fact. A CT scan and EEG performed 19 months after the vaccination showed no abnormalities. An EEG did not detect encephalopathy until more than 42 months after the vaccination. Tr., Ex. 3–A, at 18. Medical records did not document a generalized seizure until 31 months after the vaccination. Tr., Ex. 3–A, at 10.

The Report further notes the lack of contemporaneous medical evidence that the

vaccine caused David's injuries. Report, at 12. Petitioners did not provide contemporaneous medical records documenting David's injury and relating David's condition directly to the vaccine. Rather the Report states that "it is not clear from the record when [David's] symptoms first appeared." *Id.*

Dr. Lowell E. White, petitioners' causation witness, also noted repeatedly the absence of contemporaneous medical records. Dr. White stated:

> The thing that was confusing to us as clinicians was why during the time that the child was obviously behaving peculiarly which were changes in consciousness that the child didn't get into a point of medical observation but I just have to accept the fact that that happened.

Tr., at 82. At other points, Dr. White noted that portions of his medical opinion were based on what David's mother told him, not on medical observations, tests, or examinations. *See, e.g.,* Tr., at 83, 89. Due to the gaps in medical records, Dr. White often employed uncertain terms— e.g., "I just have to assume that something went on in terms of just the chronology of this.... it certainly sounded to all of us that were involved ... I think we all felt that way...."—to describe his medical opinions. Tr., at 83–84.

The Act requires the court to base a finding of compensability on "medical records" or "medical opinion." 42 U.S.C. § 300aa–13(a)(1). The dearth of medical records at the time the vaccine allegedly inflicted damage upon David's brain raises considerable barriers to a finding of causation in fact. These barriers become higher in the face of uncertain signals sent by testifying physicians, CT scan results, and the first EEG examination.

Several medical doctors testified at the August 10, 1989 hearing in Pensacola, Florida. Dr. Benton, David's family doctor, did not testify about the cause of David's injuries, but indicated that he observed no symptoms of encephalopathy or seizure disorder in the 15 days following the vaccination. Tr., at 32. Dr. Benton further testified that David may have contracted measles before administration of the vaccine. Tr., at 15–16; 29. Dr. Benton also noted that David suffered from recurring acute infections. Tr., at 19–20; 25–26.

Dr. Axley, David's other treating physician, did not testify, but compiled records of his examinations. He described David nearly 19 months after the vaccination as "very hyperactive and demonstrates while constantly in motion throughout the office some mild decrease in fine and gross motor skills but rather good coordination and good energy levels." Notice, Section IX, p. 1. Neither of David's treating physicians, who on occasion saw David as often as four or five times within a month, presented medical records or medical opinion that the vaccine caused David's injuries.

Dr. White, presented by petitioners as their causation witness, also left many causation questions unanswered. As the Report documents, "Dr. White was unable to state with certainty that the MMR vaccine caused encephalitis in David, but he 'felt' that he had ruled out causes other than a viral infection." Report, at 10. Dr. White stated that he did not know whether the vaccine injured David. Tr., at 82. Moreover, Dr. White's "feeling" that he had ruled out causes other than a virus does not clearly associate the damaging infection with the vaccination. Rather, when asked point-blank if he could state with a reasonable degree of certainty the event which caused David's condition, Dr. White responded:

> He [David] has a condition now that is certainly explainable by encephalopathy of a stable nature and could well have been the result of a post-infectious response, allergic response within the brain that we call encephalitis.

Tr., at 82. Dr. White said David has a condition "explainable by encephalopathy" which "could well have been the result" of an infection. In response to this direct causation question, Dr. White did not say David's encephalopathy was caused by infection; nor did he say that the damaging infection was the result of the vaccination.

Petitioners' counsel immediately asked Dr. White if the MMR shot caused David's encephalitis. Dr. White responded:

> Well, I don't think when I saw him that I could say one way or the other. I think what I end up seeing as a clinician is that here are the facts and what we've got it down to was gathering a fair amount of data that made us zero in to that event.
>
> That event, when we started to get all of the data, followed the typical kind of a pattern that you see in post-infectious encephalitis, *whether due to vaccine or what I don't know.*

Tr., at 82 (emphasis added). In other words, Dr. White was searching for some answer to the riddle posed by David's condition. By a process of elimination, he felt that he had narrowed the cause down to post-infectious encephalitis. Dr. White could not identify the cause of that infection as the vaccine. Discussing the cause of the damaging infection, Dr. White said, "whether due to vaccine or what I don't know." *Id.*[3]

Dr. White also testified that David was very susceptible to infections. In fact, when Dr. White tested for measles antibodies, David reacted both to the measles and the vehicle. Tr., at 94. This reaction prevented Dr. White from interpreting the test results, but established David's sensitivity to infection. Tr., at 95. Indeed Dr. White testified that David "tends to have an awful lot of fever problems, allergic problems, et cetera." *Id.* Moreover Dr. White stated that David's susceptibility to fevers and allergies "may be significant" to David's injury. Tr., at 95.

Medical records, including EEG tests, did not document David's encephalopathy until long after the vaccination. David's medical records and medical testimony from Drs. Benton and White indicate that David was very susceptible to infection. Therefore, Dr. White's failure to state which infection, if any, caused David's injury takes on significance. Linking David's injury to infection does not identify which infection or infections may have caused David's tragic condition. These factors place added weight on Dr. White's statement that he did not know if the vaccine was the infection that caused David's injury. Unlike other petitioners alleging causation in fact, *see, e.g., Donald Shaw, et al. v. United States,* 18 Cl.Ct. 646 (Cl.Ct.1989), no doctor or medical professional testified that the vaccine caused the injury.

The Report does not set forth any medical theory of causation to support a finding of causation in fact. Dr. White testified about David's susceptibility to infection, but could not relate that susceptibility to the vaccine. Rather Dr. White made his conclusion about viral infection causation very general. He did not identify which infection may have caused David's injury. Petitioners do not present any medical theory explaining the logical sequence of cause and effect leading from the vaccination to the injury which appeared many months later.

### Alternative Etiology

The Act also requires this court to determine the absence of causes other than the vaccination before awarding compensation. 42 U.S.C. § 300aa–13(a)(1). A successful showing of legal causation or causation in fact does not entitle petitioners to compensation. This court must still determine that the preponderance of evidence does not show an alternative cause for the injury.

Section 300aa–13 specifically requires petitioners to carry the burden of proving a Table injury or causation in fact. Section

---

**3.** The Special Master asked Dr. Robert K. Wilson several questions about causation during the hearing. Dr. Wilson had written a letter on December 7, 1988, linking David's injury to the approximate time frame of the vaccination. Notice of Additional and Supplemental Medical Records, No. 88–32V, filed Feb. 7, 1989, Section X. Under questioning about the cause of the injury, however, Dr. Wilson stated:

> It was almost impossible for me to form an opinion....

Tr., at 133. Dr. Wilson had gleaned his observations about causation of the injury from Dr. White's examination and conclusions. Tr., at 134–35. Dr. Wilson felt incapable of forming an independent opinion of causation. Tr., at 135, 138. The Report did not rely on Dr. Wilson's testimony for any causation findings.

300aa–13, however, does not state whether petitioners or respondent carry the burden of showing the absence of an alternative cause. This court must weigh the record as a whole to determine whether the evidence, by a preponderance, indicates an etiology unrelated to the vaccine. Both the petitioners and the respondent provide evidence concerning causes of the injuries. 42 U.S.C. § 300aa–11(c); 42 U.S.C. § 300aa–12(b). This court weighs that evidence to determine whether the injury is due to a cause other than administration of the vaccine. 42 U.S.C. § 300aa–13(a)(1)(B).

Section 2114 of the Act lists several alternative etiologies for encephalitis, including "infection, toxins, trauma, or metabolic disturbances." 42 U.S.C. § 300aa–14(b)(3)(B). Dr. White testified that he had ruled out trauma, Tr., at 86, and heredity, Tr., at 79, as alternative causes of David's condition. When asked if he had ruled out causes other than a viral infection, Dr. White responded:

> Well, to all of us that were involved we felt we had. I think you can continue to do laboratory studies but that's sort of a debate rather than the real problem, which is a clinical one. I think we all felt that way and I could really say no more than that.

Tr., at 84.

Infection is one of the alternative causes of encephalopathy. David's medical record shows that he contracted numerous infections before the vaccination, immediately after the vaccination, and after the vaccination but before medical records indicate appearance of the injury.

Based on the preponderance of the evidence, this court accepts Dr. White's somewhat equivocal medical opinion that a viral infection caused David's injuries. The preponderance of evidence—including CT scans, EEG tests, medical records, and the testimony of Drs. Benton and White—does not indicate which of David's many infec-

tions caused David's injuries.[4] The record does not provide this court with sufficient evidence to determine that the vaccine caused the damaging viral infection. Dr. White directly testified that he did not know that the vaccine caused the injury. David's injury could have been the result of a viral infection unrelated to the vaccine.

The Report based its finding of causation in fact, in large part, on Dr. White's feeling that he had ruled out causes other than a viral infection. The Report did not consider Dr. White's testimony that he did could not identify the infection which caused the injury. Rather the Report concluded that the record contained "no more reasonable explanation for the encephalopathy [than the vaccination]...." Report, at 12. Thus, the Report mixes evidence about alternative etiologies with evidence of causation in fact. As discussed above, this conclusion does not take into consideration the evidence of other infections in David's medical records. Moreover the statute draws distinctions between proof of causation in fact and absence of an alternative etiology.

Section 300aa–13 clearly requires evidence of both causation in fact and lack of an alternative etiology before the court may award compensation. The absence of an alternative etiology does not satisfy the independent statutory requirement of causation in fact. Causation in fact requires proof, by medical opinion or medical evidence, 42 U.S.C. § 300aa–13(a)(1), of a logical causal relationship between the vaccination and the injury.

On occasion, conclusive medical evidence eliminating all possible causes other than the vaccine may contribute to a finding of causation in fact. Causation in fact must nonetheless include medical testimony independent of proof about alternative etiologies. In this case, however, the treating and examining physicians could not conclu-

---

**4.** Dr. Benton, the treating physician, and Dr. White, the reviewing physician, reached some different conclusions about some of these infections. Dr. Benton testified that David may have been suffering from preexisting infections at the time of vaccination. Tr., at 25–29. Dr. White testified that these preexisting infections might have been bacterial, rather than viral. Tr., at 90–91. Dr. White said the symptoms described by Dr. Benton are "usually not" viral infections. Tr., at 91.

sively eliminate all other causes and could not state that the vaccine caused the injury.

■ Section 2113 of the Act purposefully distinguishes between petitioners' duty to prove causation and the court's duty to determine the existence of an alternative etiology. In order to award compensation, this court must determine both that petitioners met their burden by a preponderance of evidence and that a preponderance of evidence shows no alternative cause. The record to date does not permit this court to rule in favor of petitioners on either issue.

### $30,000.00 Cap

The Report recommended award of $150,000.00 for pain and suffering, $334,328.00 for lost wages, and $12,890.95 for attorney fees and costs. Report, at 31. Respondent contends that this recommended award would exceed the $30,000.00 statutory cap of 42 U.S.C. § 300aa–15(b). Respondent would apply the cap to the aggregate of pain and suffering, lost wages, and attorney fees and costs. The Report recommends application of the cap to only that portion of attorney fees and costs expended to prove damages for pain and suffering and lost wages. Report, at 25–31.

■ The language, legislative history, and logic of § 300aa–15(b) support respondent's reading of this provision. In retroactive cases—cases where the vaccination occurred before enactment of the Act —§ 300aa–15(b) lists what compensation the court may award. Specifically, the first clause of § 300aa–15(b) states that the court "may not" award pre-judgment medical or rehabilitative expenses. 42 U.S.C.

§ 300aa–15(b). Under the next clause of § 300aa–15(b), the court may award attorney fees and costs provided in subsection 300aa–15(e). *Id.* Finally, according to § 300aa–15(b)'s final clause, the court may award compensation for lost wages under § 300aa–15(a)(3) and for pain and suffering under § 300aa–15(a)(4), "except that the total amount that may be paid [for these two items] ... and included as attorneys' fees and other costs" may not exceed $30,000.00. The Act does not expressly state, but clearly intends, that this court may award compensation for post-judgment medical and rehabilitative expenses in retroactive cases.[5]

■ By setting off the exception clause with a comma, the Act shows an intention to apply the $30,000.00 cap only to those elements listed after the grammatical separation—lost wages, pain and suffering, and attorney fees and costs. The words "the total amount" also suggest the totalling of different compensation elements—lost wages, pain and suffering, and attorney fees and costs—before application of the limitation. Indeed, as pointed out earlier by the Claims Court, the "and included as" language also links references to the different elements of §§ 300aa–15(a)(3), (a)(4), and (e). *Mikulich v. Secretary of Health & Human Servs.*, 18 Cl.Ct. 253 (Cl.Ct. 1989). The court must add these different elements together before applying the cap. The statutory language supports respondent's reading.

To the extent that ambiguity remains after an analysis of the statutory language, the legislative history of § 300aa–15(b) also states that the cap applies to the aggregate of awards under §§ (a)(3), (a)(4), and (e). Congress added the contested language to the Act in the Omnibus Budget Reconcilia-

---

5. The legislative history expressly states this intent. For instance, the House Report on the Omnibus Budget Reconciliation Act of 1987 included a letter from the Congressional Budget Office:

Under current law, limited compensation would be available to those who suffered certain vaccine-related injuries prior to the effective date of the program. For these retroactive cases, compensation would be made to cover death settlements and attorneys' fees

and periodic payments would be made to cover future medical and rehabilitation expenses. H.R.Rep. No. 391(I), 100th Cong., 1st Sess. 693 (1987), *reprinted in* 1987 U.S.Code Cong. & Admin.News 2313–1, 2313–367. Furthermore, the section-by-section analysis in that Report stated:

The Act allows retroactive cases to recover only for ongoing medical expenses and for attorney fees and costs.

*Id.* at 2313–371.

tion Act of 1987. The House Report accompanying that 1987 amendment included a letter from the Congressional Budget Office:

Although the types of compensation payable [in retroactive cases] would be expanded under the bill, a limit of $30,000 would be imposed on the total of payments for income loss, attorneys' fees and pain and suffering.

H.R.Rep. No. 391(I), 100th Cong., 1st Sess., 693 *reprinted in* 1987 U.S.Code Cong. & Admin.News 2313–1, 2313–367.

The section-by-section analysis of § 300aa–15(b) further clarified:

The amendments also authorize payment for lost earnings and pain and suffering [in retroactive cases], but limit the amount of payment that can be made for all compensation except future medical expenses to a total of as much as $30,-000, depending upon demonstrated need and particular circumstances.

H.R.Rep. No. 391(I), 100th Cong., 1st Sess, 697–698 *reprinted in* 1987 U.S.Code Cong. & Admin.News 2313–1, 2313–371–2313–372. These statements in the House Report clarify that the $30,000.00 cap applies to the total of three elements of compensation.

Finally, petitioners argue for application of the cap only to attorney fees. Petitioners, however, offer no reasonable explanation for why Congress would apply the cap to only that portion of attorney fees generated in proving pain and suffering and lost wages. Petitioners are most likely to incur attorney fees in proving entitlement to compensation, yet the Report would exempt those attorney fees from the cap. Thus, a limit on attorney fees would not logically encompass only those attorney fees incurred to prove two narrow kinds of compensation.

The Report's reading of § 300aa–15(b) would compensate some attorney time and subject other attorney time to a cap. Thus, a determination of attorney fees would require apportionment between capped and fully compensable attorney fees. The Claims Court has commented on the difficulty of such apportionments:

It would be nearly impossible to segregate the efforts expended on the liability issue from those devoted to damages questions in this case.

*Kunz Const. Co., Inc. v. United States,* 16 Cl.Ct. 431, 435 (1989). In vaccine cases, proof of liability is also intertwined with proof of damages. For this reason as well, the Report's reading of § 300aa–15(b) defies application.

This court determines that § 300aa–15(b) requires application of the $30,000.00 cap to the total compensation awarded for pain and suffering, lost wages, and attorney fees and costs.

### *Accounting for Health Benefits*

Section 2115(g) of the Act states:

Payment of compensation under the Program shall not be made for any item or service to the extent that payment has been made, or can reasonably be expected to be made ... under an insurance policy, or under any Federal or State health benefits program....

42 U.S.C. § 300aa–15(g). Further § 300aa–15(h) provides:

No policy of health insurance may make payment of benefits under the policy secondary to the payment of compensation under the Program....

42 U.S.C. § 300aa–15(h). Thus the Act ensures that the Program is not primarily liable for vaccine-related injuries. Instead this court must reduce compensation by any amounts reasonably anticipated from a federal or state health benefits program.

In the case at bar, respondent claims that David "likely would be income eligible for the Medicaid program in his particular state." Objection, at 17. In making this statement, respondent makes an assumption. Respondent assumes that David's home state will not consider any compensation awarded under the Act in determining David's eligibility under Medicaid. If David's state of residence does consider the award, David may not be eligible for Medicaid at all. Under that circumstance, this court would not fairly reduce David's compensation by amounts it can reasonably

anticipate he will never be eligible to receive.

Respondent is correct that the Report should consider whether David might get Medicaid benefits. If David is likely to get Medicaid, § 300aa–15(g) will operate to reduce the amount of the compensation. If David is not likely to qualify for Medicaid, § 300aa–15(g) will not operate.

### Expert Witness Fees

■ Petitioners question the standards employed by the Report to limit expert witness expenses. The Report invoked 28 U.S.C. § 1821 (1982) to limit recoverable expenses for testimony by experts to $30.00 per day. The Report also cites *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987). In *Crawford,* the Supreme Court reviewed an award of fees for expert witnesses to a prevailing party under the general rule of Fed.R.Civ.P. 54(d). The Court concluded:

[A] federal court is bound by the limits of § 1821, absent contract or explicit statutory authority to the contrary.

*Crawford,* 482 U.S. at 439, 107 S.Ct. at 2496. 28 U.S.C. § 1821 states:

(a)(1) Except as otherwise provided by law, a witness in attendance at any court of the United States ... shall be paid the fees and allowances provided by this section.

Both *Crawford* and 28 U.S.C. § 1821 note that explicit statutory authority may take precedence over the strict $30.00 per day limit. The Act expressly permits the Claims Court to award "an amount to cover—

(A) reasonable attorneys' fees, and

(B) other costs,

incurred in any proceeding on such petition." 42 U.S.C. § 300aa–15(e).

This court must also read this express authorization to award "other costs" in the context of the rest of the statute. The Act, for instance, requires the Claims Court to base its judgments on "medical records" and "medical opinion." 42 U.S.C. § 300aa–13(a)(1). The Claims Court must also consider "all other relevant medical and scientific evidence," including diagnoses, medical conclusions, medical judgments, or autopsies. 42 U.S.C. § 300aa–13(b)(1). The Act contemplates that the Claims Court must rely on expert testimony from doctors and other highly trained medical professionals. The United States Court of Appeals for the Eighth Circuit has also allowed expenses for expert witnesses beyond the limits of 28 U.S.C. § 1821 because the testimony was crucial to resolution of the issues. *Crues v. KFC Corp.,* 768 F.2d 230, 234 (8th Cir. 1985).

During oral argument, both respondent and petitioners agreed that a $30.00 cap on expert witness fees would make it difficult, if not impossible, to obtain expert medical witnesses. In light of the explicit statutory authorization to award "costs incurred in any proceeding on such petition" and the statutory requirement to employ medical expert testimony, this court determines that the $30.00 cap in 28 U.S.C. § 1821 does not apply to cases under the Act.

### Attorney Fees

Petitioners object to the Report's findings on attorney fees. Petitioners object to the Report's reduction in the recommended hourly fee from $95.00 to $90.00 per hour. Petitioners also object to the Report's denial of a bonus or multiplier on the basis of the skill of petitioners' attorney and the complexity of the issues.

The Act provides that reasonable attorney fees and costs shall accompany any compensation award. 42 U.S.C. § 300aa–15(e)(1). Section 300aa–15 also permits the Claims Court to award reasonable attorney fees and costs if the petition does not show sufficient evidence for compensation. *Id.* In these cases, the petitioner must have brought the claim in good faith and based the claim on reasonable grounds. 42 U.S.C. § 300aa–15(e)(1).

The Report appropriately awarded the petitioner attorney fees and adopted the lodestar method to set the amount of a reasonable award. Report, at 21–25. The Supreme Court has repeatedly adopted the

lodestar approach to set reasonable attorney fees. *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Blanchard v. Bergeron*, — U.S. —, 109 S.Ct. 939, 945, 103 L.Ed.2d 67 (1989). The Report's lodestar calculation—the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate—implements accurately the Act's requirement for attorney fee awards.

█ The Report also rejected petitioner's request for an upward adjustment to the lodestar. The Supreme Court has stated that many factors cited by petitioners as justification for a bonus—novelty or complexity of issues, quality of representation, prevailing rates in the locality for similar cases—are already included in either the billable hours or hourly rate component of the lodestar method. *Blum v. Stetson*, 465 U.S. 886, 898–902, 104 S.Ct. 1541, 1548–1551, 79 L.Ed.2d 891 (1984); *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). The Report also notes that the Act allows attorney fees even for unsuccessful petitioners. Therefore, the risks of undertaking these vaccine cases are slight and do not justify a multiplier. This court sustains the Report's findings concerning attorney fees.

### Enhancement of Future Medical Expenses

Petitioners seek enhancement of the Report's recommendation for future medical expenses. Petitioners argue that David will require around-the-clock medical attention and that his family will not be able to provide care as they grow older. Petitioners also argue that the Report incorrectly limits David's life span in computing its award for future medical expenses.

The Report considered testimony about the need for round-the-clock medical care for David. Report, at 16. The Report appropriately took into consideration the family's ability to fulfill some of the need. Dr. Axley's records commended David's

mother for excellent care and attempts to educate David. Notice, Section IX, at p. 1.

The Report also considered extensive testimony by Drs. White and Robert K. Wilson, and Richard Sjolander, Ph.D., about David's life expectancy. Report, at 20. The Report also correctly considered other relevant medical and scientific evidence in the form of studies about the life span of individuals with injuries similar to David's condition. *Id.* The Report's findings about David's life expectancy are reasonable and supported by the record.

Invoking § 300aa–15(g), the Report reduced David's recommended award by the amount of David's likely dental care covered by insurance. Petitioner contended at oral argument that David's insurance does not cover dental care. If the Special Master recommends compensation in a supplemental report, the recommendation shall reconsider whether dental work is covered by David's insurance.

### ORDER

This court remands this case to the Special Master for further consideration in accord with this opinion. After review of the record,[6] the Special Master shall provide this court with a supplemental report and recommended judgment no later than January 8, 1990. This schedule will permit this court to issue its judgment before tolling of the statutory time limit for this case on January 29, 1990.

---

**6.** According to the Act, the "record" means the entire "record established by the United States Claims Court in a proceeding filed under [the Act]." 42 U.S.C. 300aa–13(c).