James McCLENDON and Elizabeth M. McClendon, as next friends of Kristen McClendon, a minor, Petitioners,

v.

The SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 90–579V.

United States Claims Court.

Sept. 25, 1991.

Michael G. McLaren, Memphis, Tenn., atty. of record, for petitioners.

Richard A. Schollman, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for respondent.

## OPINION

REGINALD W. GIBSON, Judge:

The petitioners, James and Elizabeth M. McClendon, are seeking relief under the National Childhood Vaccine Compensation Act, *codified as amended at* 42 U.S.C.A. §§ 300aa–1 *et seq.* (West Supp.1991) (the Act), for injuries suffered by their daughter, Kristen McClendon. In this connection, the petition alleges that Kristen suffered compensable injuries as a result of a diphtheria, pertussis, and tetanus (DPT) vaccination that was administered to her on October 21, 1982. Special Master Paul T. Baird issued a decision denying compensation on March 8, 1991, because the petitioners purportedly failed to establish by a preponderance of the evidence the existence of either presumed causation under the vaccine injury table[1] or actual causation of such injury. Thereafter, on May 21, 1991, we remanded the petition to the special master for two reasons: first, in our view, he failed to provide an adequate explanation for his decision rejecting certain critical expert testimony adduced by the McClendons, and secondly, because the balance of his findings of fact and conclusions of law were insufficiently detailed to permit an effective review by this court. *See McClendon v. Secretary of the Department of Health and Human Services*, 23 Cl.Ct. 191 (1991).

On July 3, 1991, the special master issued his remand decision, which again denied compensation. The petitioners, thereafter, renewed their previously filed objections, and the matter is now before us a second time for review. After again carefully considering the record evidence, we now find that the petitioners are entitled to compensation under the Act inasmuch as they have established, at the very least, presumed causation under the vaccine injury table. Therefore, and for reasons ex-

---

1. The vaccine injury table is codified at § 300aa–14 and is discussed where appropriate *infra.*

plained more thoroughly below, we conclude that the special master's remand decision was arbitrary, capricious, and contrary to law. Consequently, we REVERSE and REMAND for further proceedings solely on the question of entitlement damages.

## BACKGROUND

### A. *The Statutory Scheme*

Before summarizing the facts, and prior to analyzing the decision of the special master, we think it most appropriate to give a general overview of the compensation program created by the Act. To begin with, it is now clear beyond all doubt that this legislation established a no-fault system for providing compensation to children injured by mandatory pediatric vaccinations routinely administered before admission to the public school system. H.R.Rep. No. 99–908, 99th Cong., 2nd Sess. 1, 3, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6287, 6344. In this context, therefore, we believe that it is particularly relevant to emphasize the following expression of congressional purpose:

> [C]ongress intended [to create] a quick, flexible, and streamlined system. [The original legislation] called for a compensation procedure that administered awards "quickly, easily, and with certainty and generosity." The system was intended to be fair, simple, and easy to administer "and to compensate persons with recognized vaccine injuries without requiring the individual determinations of causation of injury."

H.R.Conf.Rep. No. 101–386, 101st Cong., 1st Sess. 509, 512, *reprinted in* 1989 U.S.Code Cong. & Admin.News 1906, 3112, 3115, *citing* H.R.Rep. No. 99–660, 99th Cong., 2nd Sess. 1, 3, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6344.

In theory, at least, the compensation program procedures that Congress established appear to be relatively simple. With respect to eligibility determinations, § 300aa–13(a) outlines the following general rules for recovery:

(1) Compensation shall be awarded under the Program to a petitioner if the special master or court finds on the record as a whole—

(A) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa–11(c)(1) of this title, and

(B) that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition.

The special master or the court may not make such a finding based on the claims of a petitioner alone, unsubstantiated by medical records or medical opinion.

(2) For the purposes of paragraph (1), the term "factors unrelated to the administration of the vaccine"—

(A) does not include any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness, or condition, and

(B) may, as documented by the petitioner's evidence or other material in the record, include infection, toxins, trauma (including birth trauma and related anoxia), or metabolic disturbances which have no known relation to the vaccine involved, but which in the particular case are shown to have been the agent principally responsible for causing petitioner's illness, disability, injury, condition, or death.

Thus, in order to establish a *prima facie* right to compensation, the petitioners must first prove, by a preponderance of the evidence—that a vaccine listed on the vaccine injury table was administered, § 300aa–11(c)(1)(A); that it was administered in the United States, § 300aa–11(c)(1)(B); that it caused the injury, § 300aa–11(c)(1)(C); that the alleged injury lasted longer than six months, resulting in more than $1,000 in unreimbursable expenses, § 300aa–11(c)(1)(D); and that there has been no recovery in a previous civil suit, § 300aa–11(c)(1)(E). Of these, causation is probably the most critical element, and the right to compensation in most instances turns on this question alone.

■ The burden is, of course, on the petitioners to establish causation, like the rest of the statutory elements, by a preponderance of the evidence. "Proof by a 'preponderance' means that the petitioner must adduce evidence that makes the existence of a contested fact more likely than not." *McClendon,* 23 Cl.Ct. at 195 (citations omitted). This is a very hospitable standard, and the evidence adduced by the McClendons must be weighed accordingly. In other words, the petitioners' proof needs only to "tip the scale" by the slightest of evidentiary margins. Otherwise stated, *"[t]he standard of proof ... is simple preponderance of evidence; not scientific certainty." Bunting v. Secretary of the Department of Health & Human Services,* 931 F.2d 867, 873 (Fed.Cir.1991) (emphasis added).

■ Accordingly, the Act requires petitioners such as the McClendons to prove causation under either of two alternative theories. First, under § 300aa–11(c)(1)(C)(i), they may recover on the basis of a "table injury." "Causation in such cases is presumed." *Hines v. Secretary of the Department of Health & Human Services,* 940 F.2d 1518, 1524 (Fed.Cir.1991), *citing Bunting,* 931 F.2d at 872. The requirements for presumed causation on the basis of a table injury are outlined in the vaccine injury table. § 300aa–14. It requires proof—that a listed vaccine was administered; that a listed injury occurred; and that the first symptoms of injury manifested themselves within the time frame specified on the table for the vaccine in question.[2] Moreover, in order to establish a *prima facie* case under the express language of § 300aa–13(a)(1), the petitioners must corroborate their claims with either medical records or medical opinion.

■ Secondly, for an injury not listed on the table, or for an injury listed on the table that did not manifest itself within the specified table time frame, the petitioners may also recover by proving actual causation. § 300aa–11(c)(1)(C)(ii). Obviously, this alternative requires a more onerous method of proof. "Causation in fact requires proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury. A reputable medical or scientific explanation must support this logical sequence of cause and effect." *Strother v. Secretary of the Department of Health & Human Services,* 18 Cl.Ct. 816, 820 (1989) (citation omitted). *See also Hines,* 940 F.2d at 1525 (approving this formulation of the causation-in-fact analysis). Pursuant to this test, as well as under § 300aa–13(a)(1), the petitioners must corroborate their claims of actual causation with either medical records or medical opinion in order to establish the required nexus between the vaccine and the injury. Variances from the table, on the other hand, are not meant to act as presumptions against actual causation. *Bunting,* 931 F.2d at 871–872. In summary then, if the petitioners demonstrate the existence of *either* presumed or actual causation by a *simple* preponderance of the evidence, they have established a *prima facie* case for compensation.[3]

■ The fact finder must, however, analyze the evidence further. If a *prima facie* case of entitlement exists, § 300aa–13(a)(1)(B) instructs the fact finder to determine whether a preponderance of the evidence shows that the injury was due to "factors unrelated" to the administration of the vaccine, as that phrase is defined in § 300aa–13(a)(2). The Act implicitly places the onus of proving the existence of an alleged alternative cause squarely on the shoulders of the respondent. *See Matthews v. Secretary of the Department of Health & Human Services,* 18 Cl.Ct. 514, 518–519 (1989) (discussing the shifting burdens of proof). Thus, while the petitioners may justifiably point to the absence of alternative causes for the purpose of proving

---

**2.** The table time frame for a residual seizure disorder and an encephalopathy, the injuries alleged by the petitioners here, is three days following administration of the vaccine. § 300aa–14.

**3.** This assumes, of course, that the petitioners have also established the remaining elements outlined in § 300aa–11(c)(1) by a preponderance of the evidence.

either presumed or actual causation in their own case-in-chief, *Bunting*, 931 F.2d at 872 (citation omitted), *it is not* the petitioners' burden to disprove all possible alternative causes in order to prevail. *Bunting*, 931 F.2d at 873 (citation omitted).

■ Consequently, if the petitioners make a *prima facie* showing of presumed or actual causation under § 300aa–13(a)(1)(A), the burden necessarily shifts to the respondent to prove, by a preponderance of the evidence, that the injury was due instead to a factor unrelated to the administration of the vaccine in question. *Matthews*, 18 Cl.Ct. at 518–519. On this basis, the respondent may premise an alternative causation argument on factors which have no known relationship to the vaccine in question, § 300aa–13(a)(2)(B), but the alleged causal relationship between the "unrelated factor" and the injury in question cannot be unexplainable, unknown, hypothetical, or undocumentable, § 300aa–13(a)(2)(A). To the contrary, in endeavoring to prove, by a preponderance of the evidence, that the injury was due to a factor "unrelated to the administration of the vaccine," the respondent must show that the alleged alternative cause was "the agent *principally* responsible for causing the petitioner's illness, disability, injury, condition, or death." § 300aa–13(a)(2)(B (emphasis added).

■ It is therefore evident that the "factors unrelated to the administration of the vaccine" language in § 300aa–13(a)(1)(B) requires the respondent to prove that the supposed alternative cause, not the vaccine in question, *actually* caused the injury. In this regard, the burden that the respondent bears in proving alternative causation is basically equivalent to the test that the petitioners must satisfy if their case-in-chief is premised on an actual causation theory. That is to say, we believe that alternative causation is subject to the same causation-in-fact formulation outlined in cases like *Strother* and approved by the Court of Appeals for the Federal Circuit (CAFC) in *Hines*. In this context then, the respondent *must* demonstrate, by a preponderance of the evidence, a logical sequence of cause and effect showing that the "unrelated factor" was the actual cause of the injury. *See Hines*, 940 F.2d at 1525; *Strother*, 18 Cl.Ct. at 820. Furthermore, as in those cases where the petitioners rely on a causation-in-fact theory to establish their *prima facie* claim, "[a] reputable medical or scientific explanation must support this logical sequence of cause and effect." *Strother*, 18 Cl.Ct. at 820 (citation omitted). If the respondent fails to rebut the petitioners' *prima facie* case by establishing alternative causation in this manner, it has fallen short on its burden, and as a consequence, the petitioners are entitled to compensation under the Act.

■ In addition to the foregoing allocations of proof, we also note that close questions of causation must be resolved in favor of the petitioners. *See Johnston v. Secretary of the Department of Health & Human Services*, 22 Cl.Ct. 75, 76–77 (1991) ("Doubt is resolved in favor of the petitioner."). Congress has clearly and repeatedly indicated that it meant to provide compensation even in those cases where there is a debatable causal link between the injury and the vaccine in question so as to ensure that those with meritorious claims would receive compensation. It was for this precise reason that Congress, in its wisdom, decided to permit recovery on a theory of presumed causation under the vaccine injury table, and has twice stated that it intended to create a system that provides compensation to persons with vaccine related injuries "quickly, easily, and with certainty and generosity," and "to compensate persons with recognized vaccine injuries without requiring the difficult individual determinations of causation of injury."

Thus, with respect to the specific questions surrounding the issue of presumed causation, we note the following legislative history, which clearly indicates that Congress expected that some errors would occur in dispensing compensation on the basis of a table injury, and that any error should be committed in connection with *granting* and not denying compensation:

The Committee recognizes that there is a public debate over the incidence of

illnesses that coincidentally occur within a short time of vaccination. *The Committee further recognizes that the deeming of vaccine-relatedness adopted here may provide compensation to some children whose illness is not, in fact, vaccine related.* The Committee anticipates that the research on vaccine injury and vaccine safety mandated by this legislation will soon provide more definitive information about the incidence of vaccine injury and that, when such information is available, the Secretary or the Advisory Committee on Childhood Vaccines ... may propose to revise the Table ... *Until such time, however, the Committee has chosen to provide compensation to all persons whose injuries meet the requirements of the petition and the Table and whose injuries cannot be demonstrated to be caused by other factors.*

H.R.Rep. No. 99–660, 99th Cong., 2nd Sess. 1, 18, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6344, 6359 (emphasis added).

With this background in mind, we now turn to address the merits of the petition. In turn, we will review the evidence, identify the issues, and outline our standard of review. Finally, we will discuss our reasons for reversing and remanding the matter for a full hearing solely on the question of damages.

B. *The Facts*

Kristen McClendon was born in Jackson, Mississippi, on April 17, 1982. By all appearances, her birth was without any significant complications. On October 21, 1982, Kristen received her third DPT vaccination, also in Mississippi. Prior to the administration of the vaccine, Kristen was bright, alert, responsive, and by all accounts, developing normally. The next day, on October 22, 1982, Kristen traveled by car from Jackson to Beau Bridge, Louisiana, with her parents to visit her maternal grandparents. Shortly after they arrived, Kristen began to cry inconsolably, which developed into high pitched and unusual screaming. This inconsolable crying did not abate on October 22, 1982, and continued through much of the next day.

In fact, her crying was so persistent that no one was able to sleep the night of October 22nd. Feeling that they were ruining the weekend for everyone else, the petitioners decided to return to Jackson with Kristen on Saturday, October 23, 1982.

During the car ride home on the 23rd, both Mr. and Mrs. McClendon noticed that Kristen experienced several "shaking" or "shivering" episodes. Specifically, Mrs. McClendon stated that she saw Kristen shiver like she was cold—"a shivering jerk." Tr. 86. They called their health clinic and spoke with a nurse immediately upon arriving in Jackson, who advised them that the DPT vaccination would make Kristen uncomfortable for three or four days and told them to give her Tylenol to help her rest. Tr. 74. On October 24, 1982, Kristen continued crying, and Mrs. McClendon witnessed several more of the "shivering" episodes that she and her husband saw the day before. Tr. 75. At the time of these episodes they did not know what to make of this behavior. At trial, however, the McClendons testified that they have witnessed the same shaking and shivering episodes on innumerable subsequent occasions just before Kristen experienced recognized seizures. Moreover, according to the petitioners, Kristen did not have a fever on either October 22nd, 23rd, or 24th.

The McClendons both had to work on the following day, Monday, October 25, 1982. Because they were told that the behavior they had been witnessing in Kristen over the previous three days was to be expected, and that it would probably continue for a few more days, they placed Kristen in the care of her usual babysitter. Tr. 75. Kristen cried again during the day of October 25th, so the babysitter put her into bed with her teenage daughter for a nap. Shortly afterwards, however, her daughter reported that Kristen was jerking her right arm. Affidavit of Linda Evans, ¶ 3. The babysitter discounted the severity of this report, assuming that the jerking that her daughter described was a normal baby movement. Kristen was placed in the care of her babysitter again on Tuesday, Octo-

ber 26, 1982. She continued the crying and screaming as on the previous four days, and when the babysitter attempted to feed her, she noticed that Kristen was jerking and trying to swallow her tongue. Affidavit of Linda Evans, ¶ 6. Kristen was rushed to the hospital, where she had a recorded temperature of 103.5 degrees, and was diagnosed as having suffered a "febrile" grand mal seizure.[4] Upon examination at the hospital, it was also discovered that Kristen had a urinary tract infection.

As a result of the diagnosed urinary tract infection, Kristen was taken to the hospital for a follow-up examination on October 29, 1982. Tr. 78. She was no longer crying, shivering, shaking, or experiencing any other sort of seizure activity by this time. Tr. 78. Following this visit, Kristen was diagnosed as having acute pyelonephritis, a urinary tract condition that is characterized by symptoms of fever, shaking chills, pain in the costovertebral region, and bladder inflammation. Kristen had another grand mal seizure on January 3, 1983, but this time it was nonfebrile with a temperature of 101.5 degrees. Still another nonfebrile grand mal seizure occurred on January 4, 1983, this time with a recorded temperature of 101 degrees. An EEG was performed, and it showed some generalized and slightly more pronounced right-sided slow dysrhythmia.[5] The record clearly shows that Kristen eventually developed a mixed seizure disorder,[6] and that this is a permanent condition. It is also undisputed that the McClendons have incurred more

than $1,000 in unreimbursable expenses, and that they have not obtained relief in any other forum.

## DISCUSSION

The issue here at bar is—whether a preponderance of the evidence establishes that the DPT vaccine administered to Kristen McClendon on October 21, 1982, caused a compensable injury, either in fact or on the table.[7] The petitioners allege that Kristen experienced a table seizure disorder, a table encephalopathy, and also that the DPT actually caused the injuries from which Kristen now suffers. Conversely, the special master determined that the petitioners failed to meet their burden of proof on any of these claims, a conclusion that is vigorously contested. Our standard of review for purposes of addressing the foregoing issues is outlined in § 300aa–12(e)(2)(B), which permits us to set aside any findings of fact or conclusions of law by the special master that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Under the plain statutory language, both the findings of fact and the conclusions of law by the special master are entitled to significant deference. *Stotts v. Secretary of the Department of Health & Human Services,* 23 Cl.Ct. 352, 359 (1991).

While it is clear that we are obliged to accord substantial deference to the decision of the special master, a number of different definitions have been ascribed to each of the various terms con-

---

**4.** By statutory definition, "febrile" seizures are those that occur with an accompanying fever of 102 degrees or higher. Conversely then, "afebrile" or "nonfebrile" seizures are those with an accompanying fever of less than 102 degrees. § 300aa–14(b)(2)(B).

**5.** Dysrhythmia is a "disturbance or irregularity in the rhythm of the brain waves as recorded by electroencephalography." *Dorland's Illustrated Medical Dictionary,* p. 521 (1988).

**6.** While a precise definition was not provided, it appears that Kristen suffers both grand mal and petit mal seizures. Petit mal seizures, sometimes called absence seizures, are "marked by a momentary break in the stream of thought and activity." *Dorland's Illustrated Medical Dictio-*

*nary,* p. 1503 (1988). They generally involve only minor jerking, in contrast to grand mal seizures, which are characterized by general convulsions. *Id.* at 568.

**7.** As for the remaining elements outlined in § 300aa–11(c)(1) that must be established by a preponderance of the evidence under § 300aa–13(a)(1)(A), the petitioners have established— that Kristen received a listed vaccine (DPT); that it was administered in the United States (Mississippi); that she suffered a listed injury (a mixed seizure disorder); that the injury persisted for more than six months (it is apparently permanent); that the injury resulted in more than $1,000 in unreimbursable expenses; and that there has been no civil recovery (Affidavits of James and Mayoung (Elizabeth) McClendon).

tained in this standard of review. Nevertheless, we are constrained to follow the formulation recently espoused by the CAFC in *Hines*, 940 F.2d at 1527–28. Obviously, a decision is contrary to law if it contravenes a statutory provision or some other established legal principle. According to *Hines*, an abuse of discretion has occurred if the special master exceeds his or her authority in selecting an option outside a finite range of permissible alternatives. And finally, *Hines* teaches that the arbitrary and capricious standard is highly deferential: "If the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Id.*, 940 F.2d at 1528.

Under the standard outlined in *Hines*, we reverse because we believe that a preponderance of the evidence in fact established the existence of a table seizure · disorder. Consequently, it is our view that the special master articulated an irrational, implausible, and unreasonable basis for his conclusion that the petitioners were not entitled to recover. It also appears that the special master imposed a higher legal burden of proof on the petitioners than the preponderance standard specified by Congress, and this also amounts to legal error. Moreover, there is a want of credible evidence establishing the existence of alternative causation. We turn now to a closer examination of each issue.

A. *A Preponderance Of The Evidence Established A Table Seizure Disorder*

 The McClendons allege that they are entitled to compensation because Kristen experienced a recognized table seizure disorder. The *undisputed* evidence adduced at trial shows that Kristen was vaccinated with DPT on October 21, 1982 (a vaccine listed on the vaccine injury table), that she now suffers from a mixed residual seizure disorder (an injury listed on the vaccine injury table), and that she experienced several shivering, shaking, and jerking episodes on October 23 and 24, 1982 (within the three-day time frame specified on the vaccine injury table). Thus, with respect to the claimed existence of a compensable table seizure disorder, the *only* question before the special master was—whether a preponderance of the evidence established that the shaking, shivering, and jerking episodes on October 23 and 24, 1982, constituted the onset of compensable seizure activity. If so, the petitioners established a *prima facie* table seizure disorder under § 300aa–13(a)(1)(A), provided, of course, there is adequate corroboration by medical records or medical opinion.

Mr. and Mrs. McClendon, the only persons who actually witnessed the shaking, shivering, and jerking episodes on October 23rd and 24th, testified at trial that the physical manifestations that they observed on those two days were *identical* to bona fide symptoms that they have witnessed on many subsequent occasions just before Kristen experienced recognized seizures. However, inasmuch as they were statutorily prohibited by § 300aa–13(a)(1) from relying solely on their own testimony to prove that this behavior was the beginning of the mixed seizure disorder that ultimately developed, the McClendons adduced, as required, the expert opinion testimony of Dr. Mark Geier.

Dr. Geier is an obstetrical geneticist licensed by the American Board of Medical Genetics. He has spent more than 1,000 hours researching and reviewing—medical and scientific literature on the DPT vaccine, the medical records of children who have sustained severe reactions to the DPT vaccine, and the depositions of various expert and scientific witnesses retained by pharmaceutical companies and plaintiffs in other DPT cases. Against this background, Dr. Geier has been qualified as an expert witness on the DPT vaccine and DPT injuries, in a number of federal and state courts, and has testified as an expert in those areas in more than 30 cases instituted under the National Childhood Vaccine Compensation Act. In fact, Dr. Geier has addressed the National Academy of Sciences Institute of Medicine on the subject of toxins in the DPT vaccine, the adverse reactions associated with those toxins, and the time frame within which adverse reac-

tions can be expected to occur. Thus, he claims an expertise and specific familiarity with the adverse reactions associated with the DPT vaccine, including medical conditions known as pertussis vaccine induced encephalopathy and residual seizure disorder.

The medical records of Kristen McClendon, the contents of the vaccine petition, the affidavits attached to the petition, the report of the Secretary of the Department of Health and Human Services, and the medical report of Dr. Jean Lockhart were, *inter alia*, all reviewed and analyzed by Dr. Geier in preparation for his testimony. At trial, he testified that his examination of the evidence led him to conclude, with a reasonable degree of medical and scientific certainty, that Kristen McClendon suffered a seizure disorder and an encephalopathy developmental delay as an actual result of the DPT vaccination that was administered on October 21, 1982. Moreover, he also opined that the shaking and shivering episodes that the parents witnessed on October 23 and 24, 1982, constituted the onset of a seizure disorder, making this a vaccine table injury because the first symptoms manifested themselves within three days after the vaccine was administered. The shaking, shivering, jerking, and twitching behavior was, in the opinion of Dr. Geier, evidence of a petit mal seizure. While Dr. Geier admitted that he was not a neurologist, he nevertheless stated that he was capable of recognizing the symptoms of a compensable seizure due to his exhaustive study of the case history descriptions in the DPT literature that he has read. Dr. Geier testified that it is easy for him to compare the facts in any particular case, such as this one, with his knowledge of adverse reaction symptoms often associated with the DPT vaccine, such as seizure disorders, and form an opinion as to whether a DPT-induced seizure has occurred.

After concluding that the October 21, 1982 DPT vaccination caused compensable injuries, both on the table and in fact, Dr.

Geier went on to state his belief that there was insufficient evidence to prove an alternative cause for the mixed seizure disorder from which Kristen now suffers. In this connection, Dr. Geier testified that the urinary tract infection that was diagnosed on October 26, 1982, could be ruled out as a possible, and certainly as the principal, explanation for the injury because there is absolutely no evidence in the medical community suggesting that urinary tract infections have any relationship whatsoever to neurological brain damage. Tr. 128, 169–170. He conceded that the urinary tract infection could have caused a fever, and that this fever could have caused a febrile seizure such as the one that was diagnosed on October 26, 1982. However, febrile seizures are isolated events and do not, in and of themselves, indicate the onset of a seizure disorder. Moreover, according to Dr. Geier, febrile seizures do not lead to the sort of mixed seizure disorder that was ultimately diagnosed here. *See* Tr. 139.

In short, Dr. Geier persuasively confirmed that the symptoms that the parents saw on October 23rd and 24th were indicative of petit mal seizures; that they did indeed constitute the onset of a table seizure disorder; and that there was no other provable explanation for the subsequent development of the mixed seizure disorder that currently plagues Kristen. The parents also testified that they now recognize those shaking and shivering episodes as seizures. On this record as a whole, in the absence of probative evidence establishing by a preponderance of the evidence that some unrelated factor[8] was *principally* responsible for the injuries in question, *see infra*, the petitioners have established a *prima facie* case of entitlement to compensation under the Act.

 The respondent attempted to meet this burden by adducing the opinion testimony of Dr. Lockhart. Between 1954 and 1962, she was engaged in private practice as a pediatrician. From 1962 through

---

**8.** It is indisputable that no § 300aa–13(a)(1)(B) unrelated factor is principally responsible for the petitioner's injury. This is clearly so because after finding insufficient proof of either a table injury or causation-in-fact, the special master held that—"no finding need be made as to the actual cause of Kristen's condition, *and no such finding is made*" (emphasis added).

1973, she was involved in drug research with the Food and Drug Administration; and from 1973 through 1988, Dr. Lockhart served as the Director for Maternal, Child and Adolescent Health Division, American Academy of Pediatrics. Dr. Lockhart flatly opined that Kristen did not experience any compensable injuries under the Act as a consequence of the administration of the vaccine. With respect to the alleged existence of a table seizure disorder, Dr. Lockhart stated the obvious by pointing to the absence of any medical records as proof that there were no symptoms indicating the onset of a seizure disorder. Tr. 179–180.

As for the physical symptoms displayed by Kristen on October 23rd and 24th, Dr. Lockhart blandly stated that they could not have been seizures because the parents would have undoubtedly recognized them as such at the time because seizures are very frightening events. Tr. 181–182. She did concede that those movements could have been tonic-clonic [9] seizures, but did not think so because the first diagnosed seizure on October 26 was of the grand mal variety. Moreover, she opined that the sort of jerking seizures described by the parents do not occur in children that age.

In view of the foregoing, Dr. Lockhart was of the opinion that the DPT vaccine did not have anything to do with the injuries experienced by Kristen McClendon. She further opined that there was an "ample medical basis" to support the proposition that the fever that Kristen developed as a result of her urinary tract infection could have caused the convulsions. If an infant under the age of 12 months suffers from febrile seizures, Dr. Lockhart concluded that the prognosis for normal neurological development is poor because they are much more likely to develop epilepsy. Finally, she opined that the seizure disorder that currently exists *might* be due to an unknown underlying cause, or that it *might* be due to periods of anoxia which accompany grand mal seizures. Tr. 200, 212–213.

This opinion testimony was, however, pure speculation, and apparently recogniz-

ing such, the special master forcefully discredited it in his initial decision and again in his remand decision. In the former he stated that "Dr. Lockhart demonstrated a woeful lack of understanding of the occurrence of seizures in infants." Original Decision at 8. Similarly, in his second decision the special master stated that "Dr. Lockhart displayed ... a lack of understanding concerning the types of seizures experienced by infants." Remand Decision at 6. Consequently, because the opinion testimony of Dr. Lockhart was thoroughly discredited by the special master, the only credible expert opinion evidence left in the record was that adduced by the petitioners' expert, Dr. Geier. As we have already explained, given the unimpeached testimony of the parents, and the opinion testimony of Dr. Geier, as well as the lack of any countervailing evidence of alternative causation supported by a reputable medical or scientific explanation, *see infra*, there certainly was more than a preponderance of the evidence, on the record as a whole, proving the existence of a table seizure disorder. We find that the aggregate evidence adduced by the petitioners was more than enough to prove a *prima facie* case of entitlement by a preponderance of the evidence, and, therefore, the special master should have awarded compensation.

 He did not do so, however, because he improperly refused to give appropriate credence to the expert opinion testimony of Dr. Geier. While it is true that the special master is not obliged to accept the testimony of an expert witness, § 300aa–13(b)(1), it is, nevertheless, equally true that he cannot summarily discard that opinion evidence without a thorough and rational explanation. *Bunting,* 931 F.2d at 872–873. This is particularly true in cases, such as this one, where there is no credible contrary evidence in the record. *Bunting,* 931 F.2d at 872–873. To reject the expert opinion testimony of Dr. Geier under these circumstances, we believe, is the essence of arbitrary and capricious decisionmaking. *See McClendon,* 23 Cl.Ct. at 199. This is

9. A tonic-clonic or "tonoclonic" seizure is a "spasm consisting of convulsive twitching of the muscles." *Dorland's Illustrated Medical Dictionary,* p. 1730 (1988).

so where, as here, the special master failed to offer a plausible, reasonable, or rational explanation for his decision to discard the probative opinion testimony adduced through Dr. Geier.

In this regard, the special master outlined the following reasons for his decision:

Unfortunately, neither of the expert witnesses is a neurologist or has other special expertise in interpreting neurological signs. Dr. Geier knows a lot about the DPT vaccine, but when the issue is whether or not a Table injury occurred, knowledge about the DPT vaccine is not particularly helpful, because the issue is whether the event described in the Table occurred, not what caused it. Knowledge about DPT vaccine does not render one better able to diagnose a seizure, shock collapse or an encephalopathy. Therefore, Dr. Geier's knowledge of the DPT literature does not enhance his credibility on the issue of whether or not the symptoms displayed by Kristen on October 23 or 24 constituted seizure activity. Dr. Lockhart has experience treating infants in her capacity as a pediatrician, but she, too, lacks any special expertise in interpreting neurologic signs. In fact, Dr. Lockhart displayed what seems to the undersigned—based on his own experience in hearing Program cases—a lack of understanding concerning the types of seizures experienced by infants. Therefore, the undersigned did not consider it appropriate to give any particular weight to the testimony of either expert.

Remand Decision at 6 (footnote omitted).

In his *initial* decision, at 8, the special master noted that the testimony of the expert witnesses "provides very limited assistance to the court in its assessment of whether a Table injury occurred." The special master perceived the testimony of Dr. Geier to be of limited assistance because "[he] was too ready to find an encephalopathy and dismissed too easily the possible complications of developing pyelonephritis." With respect to Dr. Lockhart's testimony, the special master concluded that "[she] demonstrated a woeful lack of understanding of the occurrence of sei-

zures in infants." However, in his *remand* decision, the special master, as an afterthought, now contends he gave "[no] particular weight to the testimony of either expert." This court observes that the special master failed to make this emphatic statement in his initial decision, and we do not now view it as anything other than a "bootstrapping" explanation that is unsupported by the record as a whole. Additionally, Dr. Lockhart was again thoroughly and similarly discredited by the special master, and Dr. Geier's expert opinion testimony was deemed of limited assistance only because he was "too ready to find an encephalopathy."

The statute only requires the petitioners to corroborate their claims with some credible medical evidence, either expert opinion testimony or medical records, § 300aa–13(a)(1)(B); it does not require the petitioners to support their claims with the testimony of a specialist. As stated in *Bunting*, 931 F.2d at 873, "[i]t is not plaintiff's burden to disprove every possible ground of causation suggested by defendant nor must the findings of the court meet the standards of the laboratorian." Indeed, in evaluating the evidence, § 300aa–13(b)(1) specifically instructs the fact finder to fully consider *all relevant* medical and scientific evidence in the record. If it is relevant, it must be placed on the scales along with all of the other evidence in the record. The testimony of an expert with the level of experience of Dr. Geier is, therefore, in our judgment, relevant and extremely probative, notwithstanding the fact that he is not a neurologist. Thus, under the circumstances of this case, the fact that Dr. Geier was not a neurologist, in and of itself, was a wholly insufficient reason for rejecting the substance of his opinion testimony. One, especially a medical doctor, does not necessarily have to be a neurologist in order to interpret neurological signs.

Perhaps an analogy will illustrate the point. Suppose the evidence in this case included a medical record prepared by a general practitioner within the three-day table time frame, and based on the same symptoms described by the parents and relied on by Dr. Geier, the general practi-

tioner came to the conclusion that Kristen experienced compensable petit mal seizures. That diagnosis would constitute nothing more than a recorded medical opinion, and in such a case we would not discard that opinion merely because the good doctor was not a neurologist inasmuch as § 300aa–13(a)(1)(B) statutorily contemplates the consideration of such evidence on one or more operative issues. To do so, in the face of the guiding statutory provisions, would surely be arbitrary and capricious. Indeed, that recorded medical opinion would be extremely probative, notwithstanding the fact that the doctor was not a neurologist. If that doctor had any experience in diagnosing the existence of a seizure in other infants, even if this experience was limited to one or two previous cases, the credence that we would attach to that opinion would, of course, be somewhat enhanced. Certainly, to rebut that opinion, the respondent would be forced to show that the symptoms were not indicative of seizures, or that they were actually caused by something other than the DPT vaccine, the precise burden imposed on the respondent by § 300aa–13(a)(1)(B). By shifting the burden of proof in this way, the Act ensures that the respondent will have an opportunity to challenge *any* corroborating medical evidence adduced by the petitioners.

With respect to the special master's comment that "the testimony of the expert witnesses [was] considered to be of very limited assistance," particularly with reference to Dr. Geier, we find, given the record as a whole, that this is nothing more than a transparent effort to support an ultimate conclusion under circumstances where the facts are wanting. In attempting to discredit Dr. Geier, the special master conceded that "Dr. Geier knows a lot about the DPT vaccine," but then went on to say that knowledge about the DPT vaccine—"is not particularly helpful"; "does not render one better able to diagnose a seizure, shock collapse, or an encephalopathy"; and "does not enhance his credibility" because "the issue is whether or not a Table injury occurred ... not what caused it." We think this reasoning is incredulous, to say the

least. Thus, to say that knowledge and experience of an expert medical witness relative to the cause of injuries, etc. stemming from the administration of the DPT is not a critical factor in his opinion testimony is to completely miss the mark. Certainly, the special master cannot rationally contend that the opinion testimony of Dr. Geier should be ignored while at the same time admitting that Dr. Geier "knows a lot about the DPT vaccine." It is also evident, on this record, and again contrary to the assertions of the special master, that Dr. Geier is eminently qualified to diagnose the existence of a seizure disorder or encephalopathy under the terms of the Act. In this regard, Dr. Geier's expertise and professional credibility clearly transcends that of Dr. Lockhart. Given the totality of the circumstances, therefore, it is crystal clear that Dr. Geier's testimony is entitled to substantially more weight than that of Dr. Lockhart and, as in *Bunting, supra,* must be duly considered.

Moreover, the record persuasively shows that Dr. Geier has had *extensive* experience in the area of the DPT vaccine, and the case that the special master makes for rejecting his opinion is, we believe, built on a false premise. Dr. Geier may not be a neurologist, and neither is Dr. Lockhart, but he has scrutinized hundreds of case histories discussing the seizure symptoms that customarily follow the administration of the DPT vaccine. Tr. 123. He has studied the cause and effect relationship between the DPT vaccine and the injuries that are commonly associated with it, and one of the most common consequences is the development of a residual seizure disorder. Certainly, Dr. Geier is familiar with the seizure symptoms that are commonly associated with the DPT. Because Dr. Geier is thoroughly familiar with the symptoms described in the numerous DPT case histories that he has examined, we believe that he is equally capable of comparing them with the symptoms and etiology of the mixed seizure disorder that developed here. Thus, contrary to the assertions of the special master, the record clearly shows that Dr. Geier was more than quali-

342

fied to render an expert opinion as to—whether the symptoms displayed by Kristen on October 23rd and 24th indicated the onset of a seizure disorder, and that he does have other expertise which qualifies him to interpret neurologic signs for the limited purpose of discerning whether there was a table seizure disorder. To assert otherwise defies logic, and runs counter to the record evidence.

■■■ We next note that the special master, instead of determining whether the petitioners established each of the three elements for a table seizure disorder by a mere preponderance of the evidence, imposed what amounts to a higher burden of proof on the petitioners. In this regard, the special master, after rejecting the opinion evidence of both experts, attempted to analyze the medical evidence on his own. He stated that the petitioners were not entitled to recover on the basis of a table seizure disorder because:

> *Without convincing expert testimony* that a seizure occurred during the Table period, *the petitioners failed to meet their burden of proving a Table seizure disorder.* The undersigned found that there was not a preponderance of the evidence that Kristen's first seizure or convulsion occurred within three days following the administration of the DPT vaccine on October 21, 1982, because the weight of the evidence that the symptoms observed during that period did not constitute seizure activity was greater than the evidence that they did constitute seizure activity.

Specifically, it was considered significant that the first recorded seizures were not of the myoclonic type. Rather, the seizure on October 26 was a grand mal seizure, and Kristen continued to have only grand mal seizures for several months thereafter. She had her first focal seizure on July 1, 1983, ... and did not have her first recorded myoclonic seizure until early 1984.... Thus, her seizure disorder evolved through stages with the myoclonic stage not appearing until about 15 months after her DPT shot. This, when coupled with the fact

that shaking chills accompany acute pyelonephritis, causes the undersigned to conclude that it was significantly more likely that the shivering was a side effect of the incipient infection than a neurological sign of the onset of a seizure disorder.

Remand Decision at 7 (emphasis added).

This explanation is pure sophistry. As we have already stated, in order to recover on a presumed causation theory under the vaccine injury table, the petitioners only need to prove three essential facts by a *simple* preponderance of the evidence. *Bunting,* 931 F.2d at 873. They must show (1) that a vaccine listed on the table was administered, (2) that an injury listed on the table occurred, and (3) that the first symptoms of that injury manifested themselves within the time frame listed on the table. *See* § 300aa–13(a)(1)(A); § 300aa–11(c)(1)(C)(i); § 300aa–14; *Hines,* 940 F.2d at 1525; *Bunting,* 931 F.2d at 872. A residual seizure disorder, such as the admitted mixed seizure disorder that exists here, is listed on the vaccine injury table. § 300aa–14(a)(1)(D). Seizures comprising a compensable residual seizure disorder may include "grand mal, petit mal, absence, myoclonic, tonic-clonic, and focal motor seizures and signs," and Kristen certainly suffered several of these different seizures. § 300aa–14(b)(4). Moreover, in order to qualify a series of such seizures as a residual seizure disorder under § 300aa–14(b)(2), the petitioners were required to show only that Kristen did not experience any febrile seizures before the administration of the vaccine, which they did (there were none here), and that Kristen had more than two nonfebrile seizures within the following year, which they also did (there were at least two statutory nonfebrile seizures here). They were obliged to corroborate these facts with credible medical records or opinion under § 300aa–13(a)(1), which they also accomplished.

Clearly then, the petitioners established a *prima facie* case of entitlement. By stating that the petitioner loses because—"[w]ithout convincing expert testimony that a seizure occurred during the Table

period, the petitioners *failed to meet their burden of proving a Table seizure disorder,*" the special master seemingly applied a higher burden of proof on this issue (emphasis added). The problem created by the foregoing is that this conclusion is reasonably deducible from a literal reading of the quoted sentence which is imprecise, inartfully drafted, and confusingly ambiguous inasmuch as it is susceptible to at least two very different interpretations. On the one hand, one could argue that the phrase "[w]ithout convincing expert testimony" was meant to characterize the weight or credibility that the special master attached to the expert testimony adduced by the petitioners here. On the other hand, one could just as easily argue that this phrase indicates that the special master meant to describe the required burden of proof that he was applying to the expert opinion evidence necessary to establish a *prima facie* case of eligibility on the basis of a table seizure disorder.

Based on our literal reading of this phrase, we think the latter interpretation is what the special master in fact stated and undoubtedly meant. In other words, it seems to us that the special master imposed a *burden*, inadvertent or not, that would have required the petitioners to prove a table seizure disorder by "convincing expert testimony." Since that is what he said, and we must assume that he meant what he said, that was clear legal error inasmuch as the petitioners were required to prove a table seizure disorder (*i.e.*, testimony of parents corroborated by medical records or medical opinion) *only* by a "simple preponderance of [the] evidence, not scientific certainty." *Bunting*, 931 F.2d at 873. Moreover, and as previously noted, the legislative history, *see infra*, underscores the fact that:

> ... the Committee has chosen to provide compensation to all persons whose injuries meet the requirements of the petition and the Table and whose injuries cannot be *demonstrated* to be caused by other factors.

(emphasis added). From a burden posture, therefore, such expert corroborating evidence is not required to meet a "convincing" standard, but rather, must only be

reliable, believable, and show that the onset of the residual seizure disorder within the three-day table time frame was "more likely than not." That is all that the statute requires of the petitioners in establishing that a table seizure disorder occurred when medical evidence is used to corroborate their claims.

Similarly, while the special master must "consider the entire record and the course of the injury" under § 300aa–13(b)(1), that does not mean that the petitioners were obligated to prove under the Act that the symptoms that Kristen displayed on October 23rd and 24th were the same as the seizures that were clinically diagnosed in the ensuing months. To the contrary, they needed to show only that Kristen experienced a seizure of the sort described in § 300aa–14(b)(4) within three days after the DPT vaccine was administered. They did establish this fact through Dr. Geier, and there was no credible countervailing evidence. Consequently, the only reasonable conclusion permitted by the corroborated testimony of the parents is that the shaking, shivering, and jerking episodes that they saw on October 23 and 24 were seizure activity.

In conclusion, we find that the special master acted arbitrarily and capriciously in rejecting the testimony of Dr. Geier. Given that evidence, we further find that the petitioners established all of the requisite elements for a table seizure disorder by a preponderance of the evidence, and thereby established a *prima facie* case of entitlement under the Act. The respondent failed to rebut that *prima facie* case with any credible proof, as evinced by the lack of credibility accorded to Dr. Lockhart by the special master, *see infra*. Finally, we find that the special master committed what amounts to an error of law by imposing a higher burden of proof than required for the purpose of establishing a table seizure disorder. Thus, the petitioners, on this record, are entitled to recover.

B. *Alternative Causation Has Not Been Established By A Preponderance Of The Evidence*

 The special master, having concluded, albeit erroneously, that the petition-

ers did not establish the existence of either a table injury or causation-in-fact, made no findings regarding alternative causation. *See* Remand Decision at 11 ("The petitioners having failed to establish [a *prima facie* case of eligibility], no finding need be made as to the actual cause of Kristen's condition, and no such finding is made."). However, since we have reversed the special master with respect to the petitioners' right to recover compensation under the Act, we must, nevertheless, reach the issue of alternative causation. In this connection, we find that there is insufficient evidence to establish that the injuries here were the result of factors unrelated to the administration of the DPT vaccine on October 21, 1982.

According to the express language of § 300aa–13(a)(2)(A), the phrase "factors unrelated to the administration of the vaccine" in question "does not include any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness, or condition." Consequently, as we pointed out earlier, in order to show that an injury is "due to factors unrelated to the administration of the vaccine," the respondent bears the burden of proving, *by a preponderance*, a logical sequence of cause and effect showing that the alleged unrelated factor was actually the cause of the injury. *See Strother*, 18 Cl.Ct. at 820. "A reputable medical or scientific explanation must support this logical sequence of cause and effect." *Id.*

Here, the respondent has failed to adduce the requisite amount of evidence to prove that the mixed seizure disorder from which Kristen suffers was *principally* caused by something other than the DPT vaccination that she received on October 21, 1982. There is no credible evidence that would establish the existence of a logical sequence of cause and effect between the alleged unrelated factor (in this case the pyelonephritis that was purportedly developing when Kristen first displayed symptoms indicating the onset of a residual seizure disorder) and the actual cause of the mixed seizure disorder. The medical records show that Kristen was diagnosed with a urinary tract infection on October 26

and that she was diagnosed with acute pyelonephritis on October 29, but these facts do not, *ipso facto*, establish alternative causation. In this regard, the respondent failed to support its allegations of alternative causation with a reputable medical or scientific explanation. The special master thoroughly discredited the testimony of Dr. Lockhart, and we agree with his criticism of her testimony.

In addition, the respondent failed to introduce any credible evidence to rebut the testimony of Dr. Geier, who firmly opined on several occasions that the urinary tract infection and subsequently diagnosed pyelonephritis could not have caused the mixed seizure disorder that presently afflicts Kristen. He emphasized that there is absolutely no evidence in the medical community to indicate that a urinary tract infection can cause neurological damage, much less a mixed seizure disorder. That the respondent failed to establish alternative causation by the requisite quantum of proof is a fact that the special master should have placed on the evidentiary scale in determining whether the petitioners made a *prima facie* showing of eligibility. *Bunting*, 931 F.2d at 872. For all of these reasons then, we find that the respondent failed to establish that the injuries here were principally the result of a factor unrelated to the administration of the vaccine, and as a result, they failed to rebut the petitioners' right to compensation under the Act.

CONCLUSION

The McClendons demonstrated, we find, the existence of a table seizure disorder, and all of the other required elements of proof, by a preponderance of the evidence. Therefore, we hold that they established a *prima facie* case of eligibility under the Act, and that the respondent failed to rebut it with the required showing of alternative causation. The petitioners are, therefore, entitled to compensation, inasmuch as we further find that the special master acted arbitrarily, capriciously, and contrary to law when he denied compensation. RE-

VERSED and REMANDED for a determination on the issue of damages.

IT IS SO ORDERED.