Coradean CAMERY, as Representative of the Estate of Philip Bobby Camery, Petitioner,

v.

The SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 90–2585V.

United States Court of Federal Claims.

Dec. 8, 1998.

Richard Gage, Cheyenne, Wyoming, for petitioner.

Mark W. Rogers, Department of Justice, Washington, D.C., with whom was Assistant Attorney General Frank W. Hunger, for respondent. Helene M. Goldberg, Director, and John Lodge Euler, Deputy Director, Torts Branch, Civil Division, of counsel.

## OPINION and ORDER

FUTEY, Judge.

This vaccine case is before the court on respondent's motion to review and set aside the special master's award of compensation for a vaccine-related death suffered by Phillip Bobby Camery (Bobby), on whose behalf petitioner, Mrs. Coradean Camery (petitioner), brought this action. On August 7, 1998, the special master determined that petitioner was entitled to compensation under the National Childhood Vaccine Injury Act (Vaccine Act), 42 U.S.C. §§ 300aa–1 to 300aa–34 (1994), as amended 42 U.S.C.A. §§ 300aa–1 to 300aa–34 (West 1998). Respondent maintains that the special master erred as a matter of law by finding that Bobby experienced jerking episodes on the evening he received his diphtheria-pertussis-tetanus (DPT) vaccine. Respondent also claims that the special master's decision to accept petitioner's testimony regarding the occurrence of Bobby's jerking episodes on the evening of his DPT vaccination was arbitrary and capricious. Petitioner argues that the special master did not err as a matter of law, and that his decision to accept petitioner's testimony over Bobby's medical records was not arbitrary and capricious.

### Factual Background

Bobby was born on August 14, 1949, at Our Lady of Mercy Hospital, in Mariemont, Ohio. On August 23, 1949, Bobby was discharged from the hospital, listed in "good" condition. As an infant Bobby received medical care from Frederick Gross, M.D. Although Dr. Gross' medical records regarding Bobby are missing from the record, other medical records provide that Bobby was generally healthy, except for frequent colds, broncho pneumonia at six weeks, and bronchitis at three months of age. According to Bobby's medical records, he was "apparently well and normal until February 14, 1950" when, during bottle-feeding, he experienced "his first spasm, consisting of tonic contractions of the flexors of his arms." Camery v. Secretary of DHHS, 90–2585V, slip. op. at 4. (Fed.Cl.Spec.Mstr. Aug. 7, 1998).

During a visit to the clinic at the Children's Hospital in Cincinnati, Ohio, on March 3, 1950, Bobby experienced several convulsive seizures, exhibiting a fluttering of his eye lids, a rolling back of his eyes in his head, and twitching in his face. On that same day, Bobby entered the infant ward of the Children's Hospital to undergo diagnostic studies of these seizures.

During his hospitalization, Bobby continued to experience spasms. Over a period of several days, medical personnel administering to Bobby noticed a fluttering of his eye-

lids, a tenseness in his arms, jerking movements in his arms, slight spasms in his arms and head, a clenching of his fists, and a staring gaze. *Id.* at 4–5. On March 11, 1950, Bobby was discharged from the Children's Hospital, with no change listed in his condition. Although Bobby's physicians were unable to determine the cause of his condition, they surmised it was idiopathic epilepsy. His physicians recommended subsequent observation at the Children's Hospital clinic.

Bobby received recurrent medical treatment at the Children's Hospital clinic for his seizures from March 1950 to September 1956. He also was placed on medication to help control his seizures. Despite this medication, Bobby continued to experience seizures, generally before falling asleep or while asleep.

In October 1957, the Camery family moved to Houston, Texas. Petitioner applied for special placement of Bobby in a class for mentally retarded children at the Houston Independent School District (the District). On October 18,1957, an assistant psychologist with the District examined Bobby. The assistant psychologist concluded that Bobby was mentally retarded, and recommended that the District place Bobby "in a class for the mentally retarded at the readiness level." *Camery*, No. 90–2585V, at 5.

On November 6, 1957, Bobby was evaluated by physicians at the Blue Bird Circle Children's Clinic for Neurological Disorders (Children's Clinic). Petitioner informed the examining physician that Bobby developed normally until he was five months old. Petitioner also informed the examining physician that after Bobby's first DPT immunization, he suffered "a febrile episode that lasted two days, with marked irritability." *Id.* Petitioner further informed Bobby's physician that Bobby then appeared normal for two weeks, after which he began having generalized convulsions, with thirty-two seizures occurring in the first twenty-four hours. The treating physician concluded that Bobby's

condition included "brain damage, secondary to pertussis immunization at five months of age."[1] Bobby received treatment at the Children's Clinic for his seizures until August 1959. Other physicians at the Children's Clinic that treated Bobby adopted the diagnosis of "post-pertussis immunization perivenous encephalitis," or "post-immunization encephalopathy." *Id.*

As Bobby grew older, his behavior became uncontrollable and destructive, requiring petitioner to place him into the Austin State School in 1959. In July 1971, petitioner transferred Bobby to the Richmond State School. The medical staff diagnosed Bobby with "mental retardation, post-pertussis immunization." *Id.* at 6. Bobby remained at the Richmond School until his death on May 29, 1997. He died of acute aspiration pneumonitis, secondary to chronic interstitial lung disease.

On October 1, 1990, petitioner filed a claim on behalf of Bobby under the Vaccine Act. In an amended petition filed on July 23, 1997, petitioner alleged Bobby died from the residual effects of a seizure disorder that he sustained within the time allotted by the Vaccine Injury Table. Specifically, petitioner claimed that Bobby exhibited jerking spells with periods of unresponsiveness, stiffness, and other symptoms, all within hours of his January 28, 1950 DPT vaccination. *Camery*, No. 90–2585V, at 1. Respondent alleged that petitioner was not entitled to compensation because Bobby's medical records did not show he suffered the onset of his seizures within three days, the time period set forth in the Vaccine Injury Table. *Id.* at 1–2. In the alternative, respondent alleged that even if the special master credited the factual testimony in this case regarding Bobby's symptoms prior to the recorded onset of his disorder, the factual testimony did not provide convincing evidence of any seizures. *Id.* at 2.

Special Master Elizabeth Wright conducted an evidentiary hearing on March 25, 1996.[2] At the hearing, petitioner testified

---

1. Respondent's Motion for Review and Memorandum of Objections (Resp.'s Mem.), Appendix (App.) at 16.

2. This case initially was assigned to Special Master Elizabeth Wright. On April 25, 1997, the case was reassigned to Special Master John Edwards.

that Bobby received his first DPT vaccination on January 28, 1950, at a clinic organized by the county at the Madison School near the Camery's home. Petitioner also testified that Bobby became ill with a fever that night, and began throwing up his milk. More importantly, she claimed that Bobby exhibited "little jerking spells," in which he would "jerk his arms, ... have a dull look in his eyes," and appeared to be stiff. *Id.* at 6. Petitioner further claimed that Bobby was irritable, cried, and kept petitioner and her husband up all night.

Petitioner testified that she called Dr. Gross on January 29, 1950, regarding Bobby's condition. Petitioner claimed that Dr. Gross examined Bobby on January 30, 1950. Petitioner asserted that when Dr. Gross performed a house call on that day, 1950, she alerted him of Bobby's jerking movements, but could not recall if Dr. Gross observed any jerking movements. Petitioner further claimed that Bobby continued to have little jerking movements until his "hard seizure" on February 14, 1950, which was more severe than the jerking movements he previously exhibited. In addition, she claimed that these spasms recurred every hour, and frequently in pairs. Moreover, petitioner averred that tonic contractions did not occur in his leg muscles and that she did not notice any vomiting.

Petitioner testified that Dr. Gross recommended she administer liquid calcium to Bobby. After three weeks of liquid calcium treatment, and no sign of improvement from Bobby, petitioner contacted Dr. Gross. Petitioner maintained that after Dr. Gross determined that a calcium deficiency was not the cause of Bobby's seizures, he recommended that petitioner take Bobby to the Children's Hospital clinic.

On February 26, 1998, Special Master John Edwards conducted an evidentiary hearing that was limited to medical testimony. Petitioner's expert, Marcel Kinsbourne, M.D., testified that Bobby's jerking episodes and hard seizures had attributes in common, to the point that any difference between them was qualitative, not quantitative. Based upon petitioner's testimony that Bobby exhibited jerking episodes on the evening of his first DPT vaccination, Dr. Kinsbourne concluded the jerking episodes constituted seizures.

Respondent's expert, Mary Anne Guggenheim, M.D., testified that petitioner's testimony regarding Bobby's condition within three days of his January 28, 1950 vaccination "[did not] make much medical sense." *Camery,* No. 90–2585V at 9. Contrary to Dr. Kinsbourne, Dr. Guggenheim determined that Bobby's medical records clearly indicated that Bobby was healthy until February 14, 1950. Dr. Guggenheim further testified that Bobby's seizure classification is "qualitatively quite different [from] startle-like jerks." *Id.* at 10. Dr. Guggenheim further testified that "a child who has startle-like jerks" that become "epileptic in nature" usually develops "the infantile spasm[-]type of seizure." *Id.* Dr. Guggenheim asserted that Bobby did not suffer from any infantile spasms, and declared it would be difficult to connect petitioner's description of startle-like jerks with Bobby's seizure on February 14, 1950. *Id.*

On August 7, 1998, the special master granted petitioner's claim for compensation. The special master found that Bobby received his first DPT vaccination on January 28, 1950. The special master made this conclusion based upon petitioner's testimony and an entry in Bobby's baby book, despite medical records that listed the date of vaccination as January 31, 1950. Further, the special master found that Bobby experienced jerking episodes on the evening of January 28, 1950. Finally, the special master, finding Dr. Kinsbourne's testimony to be convincing, held that Bobby's jerking episodes were in fact seizures. *Id.* at 12.

On September 8, 1998, respondent filed a motion for review of the special master's decision. Respondent alleges that the special master erred as a matter of law by finding that Bobby's jerking episodes began on the evening of his first DPT vaccination. Specifically, respondent argues that Dr. Kinsbourne's testimony, which is based solely upon petitioner's claims, does not substantiate petitioner's claims as required by the Vaccine Act. In addition, respondent argues that the special master's decision to reject contemporaneous medical records and accept

petitioner's testimony "wholly as truth" was arbitrary and capricious. Moreover, respondent also argues that the special master failed to address a number of issues critical to his determination. In response, petitioner asserts that the special master did not err as a matter of law in finding that Bobby exhibited jerking episodes on January 28, 1950. Additionally, petitioner avers that the special master's decision was not arbitrary and capricious.

*Discussion*

A. *Standard of Review*

When deciding a motion to review and set aside a special master's decision, the court proceeds in accordance with the rules set out in the Vaccine Act. The Vaccine Act provides:

> (2) Upon the filing of a motion under paragraph (1) with respect to a petition, the United States Court of Federal Claims shall have jurisdiction to undertake a review of the record of the proceedings and may thereafter—
>
> > (A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,
> >
> > (B) set aside any findings of fact or conclusions of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or
> >
> > (C) remand the petition to the special master for further action in accordance with the court's direction.

42 U.S.C. § 300aa–12(e)(2) (1994).

In reviewing a special master's decision, the court may not set aside the special master's findings of fact or conclusions of law unless it finds that those determinations are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Mobley v. Secretary of DHHS*, 22 Cl.Ct. 423, 426 (1991). The court reviews the findings of fact of the special master under the arbitrary and capricious standard. *Saunders v. Secretary of DHHS*, 25 F.3d 1031, 1033 (Fed.Cir. 1994); *Munn v. Secretary of DHHS*, 970 F.2d 863, 870 n. 10 (Fed.Cir.1992). This is the most deferential standard possible. *Munn*, 970 F.2d at 870. Therefore, the court may not substitute its own judgment for that of the special master. *Thornton v. Secretary of DHHS*, 35 Fed.Cl. 432, 439 (1996). "While no uniform definition of this standard has emerged, it has been formulated in a variety of ways which suggest its meaning: 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Hines v. Secretary of DHHS*, 940 F.2d 1518, 1527 (Fed.Cir.1991) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971)). Thus, "[i]f the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines*, 940 F.2d at 1528. It is within these narrow parameters that this court reviews the special master's decision, which is at issue in the present case.

B. *Establishing Compensation under the Vaccine Act*

The Vaccine Act permits a petitioner to recover for vaccine-related injuries or death under two alternative means. Under the first method, a petitioner may recover compensation if the petitioner can show that the injured person: (1) received a vaccine listed on the Vaccine Injury Table; (2) received the vaccine in the United States; (3) sustained an injury or condition set forth in the Vaccine Injury Table or died from the administration of the vaccine, and experienced the "first symptom or manifestation" of an injury within the time period provided in the Vaccine Injury Table; (4) sustained vaccine-related effects which lasted longer than six months and led to unreimbursable expenses greater than $1000; and (5) has not previously collected an award or settlement of a civil action for damages from a vaccine-related injury or death. 42 U.S.C. §§ 300aa–11(c)(1)(A)—300aa–11(c)(1)(E). If the petitioner can make such a showing, causation is presumed and the petitioner is deemed to have established a *prima facie* case of entitlement to compensation under the Act. *See*

42 U.S.C. § 300aa–13(a)(1)(A) (1994); *Whitecotton v. Secretary of DHHS*, 81 F.3d 1099, 1102 (Fed.Cir.1996). A petitioner must establish this by a preponderance of the evidence. 42 U.S.C. § 300aa–13(a)(1)(A); *McClendon v. Secretary of DHHS*, 24 Cl.Ct. 329, 333 (1991). Proof by a preponderance of the evidence requires the petitioner to show that the evidence presented makes the existence of a fact "more likely than not." *McClendon*, 24 Cl.Ct. at 333.

A petitioner may also recover compensation for injuries not occurring within the prescribed time period. This is the non-table method, and requires the petitioner to establish actual causation between the injured person's injuries and the vaccine. *Whitecotton*, 81 F.3d at 1102. Under such circumstances, if the petitioner can show by a preponderance of the evidence that the vaccine was the cause of the injured person's injuries, the petitioner is entitled to compensation under the Vaccine Act. 42 U.S.C. §§ 300aa–11(c)(1)(C)(ii), 300aa–13(a)(1)(A); *see also Whitecotton*, 81 F.3d at 1102. Under either alternative, the petitioner must corroborate petitioner's claims with medical records or medical opinion. *See* 42 U.S.C. § 300aa–13(a) (1994); *McClendon*, 24 Cl.Ct. at 333.

■ Once a petitioner has established a *prima facie* case of entitlement, the special master must analyze the evidence further in order to award compensation. *McClendon*, 24 Cl.Ct. at 333. Specifically, the special master must find that "there is not a preponderance of the evidence that the illness, disability, injury, condition or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition." 42 U.S.C. § 300aa–13(a)(1)(B). The burden of going forward then shifts to the respondent to demonstrate by a preponderance of the evidence that a "factor unrelated" to the vaccine was the actual cause of petitioner's injuries. *Id.; Whitecotton*, 81 F.3d at 1102. It must be emphasized, however, that the burden shifts to the respondent only if the petitioner has presented a *prima facie* case for entitlement. *Bradley v. Secretary of DHHS*, 991 F.2d 1570, 1575 (Fed.Cir.1993). Similarly, the special master must make an alternative cause determination only if a *prima facie* case of entitlement exists. *Id.*

C. *Decision of the Special Master*

In the present case, petitioner pursued her claim as a table-method case, asserting that Bobby suffered residual seizure disorder from his DPT vaccination. Residual seizure disorder is a table-listed injury. 42 U.S.C. § 300aa–14 (1994). The Vaccine Act provides:

(b) Qualifications and aids to interpretation

. . . .

> (2) A petitioner may be considered to have suffered a residual seizure disorder if the petitioner did not suffer a seizure or convulsion unaccompanied by fever or accompanied by a fever of less than 102 degrees Fahrenheit before the first seizure or convulsion after the administration of the vaccine involved and if—

. . . .

> (B) . . . The first seizure or convulsion occurred within 3 days after administration of the vaccine and 2 or more seizures or convulsions occurred within 1 year after the administration of the vaccine which were unaccompanied by fever or accompanied by a fever of less than 102 degrees Fahrenheit.

42 U.S.C. § 300aa–14(b).

Petitioner offered evidence in the form of her own oral testimony, affidavits, and a baby book, in an effort to establish the date of Bobby's first vaccination and demonstrate that he experienced jerking episodes the evening of his January 28, 1950 DPT vaccination. Additionally, petitioner offered the testimony of Dr. Kinsbourne to establish that these jerking episodes were seizures. The special master found that petitioner established by a preponderance of the evidence that Bobby was vaccinated on January 28, 1950, that Bobby experienced jerking episodes that evening, and the jerking episodes were seizures.

Respondent raises two arguments in opposition to the decision of the special master. Specifically, respondent argues that the spe-

cial master erred in: (1) finding that Bobby's jerking episodes began the evening of his DPT vaccination; and (2) rejecting the medical records and accepting petitioner's testimony "wholly as truth."

With regard to the first argument, respondent contends that the special master's determination that Bobby experienced jerking episodes on the evening of his DPT vaccination was contrary to 42 U.S.C. § 300aa–13(a)(1) and is thus subject to a *de novo* review by this court. Petitioner, on the other hand, asserts that the special master's determination was a finding of fact, and therefore subject to greater deference by this court under the arbitrary and capricious standard of review.

The court finds that the issue of whether Bobby experienced jerking episodes on January 28, 1950 is a finding of fact. In addition, the court finds that the issue of whether the special master properly interpreted the language of the Vaccine Act to determine that Bobby exhibited jerking episodes within the time prescribed in the Vaccine Injury Table is an issue if law. Therefore, the court must determine the appropriate standard of review.

The plain language of the statute prohibits a *de novo* standard of review. *Carlson v. Secretary of DHHS*, 23 Cl.Ct. 788, 790 (1991), *aff'd*, 968 F.2d 1227 (Fed.Cir. 1992). In fact, the words *de novo* were removed from the section of the statute regarding this court's standard of review. *Compare* 42 U.S.C. § 300aa–12(d)(1) (1988) *with* 42 U.S.C. § 300aa–12(e)(2) (Supp.I. 1989). Consequently, "the standards of review 'vary in application as well as degree of deference.'" *Charette v. Secretary of DHHS*, 33 Fed.Cl. 488, 490 (1995) (quoting *Munn*, 970 F.2d at 870 n. 10). The statute provides that the court may set aside any findings of fact and *conclusions of law* of the special master found to be arbitrary, capri-

cious, an abuse of discretion, or *not in accordance with law*. 42 U.S.C. § 300aa–12 (e)(2)(B) (emphasis added). This is a highly deferential standard of review. *Hines*, 940 F.2d at 1528; *Sapharas v. Secretary of DHHS*, 35 Fed.Cl. 503, 504 (1996). This court reviews fact findings under the arbitrary and capricious standard, legal questions under the not in accordance with law standard, and discretionary rulings under the abuse of discretion standard. *Saunders*, 25 F.3d at 1033 (citing *Munn*, 970 F.2d at 870 n. 10). Therefore, the special master's conclusions of law are entitled to deference, and respondent's assertion that a *de novo* standard of review applies is incorrect.[3]

Respondent asserts that the sole issue in this case is the timing of the onset of Bobby's seizures. Respondent claims that 42 U.S.C. § 300aa–13(a)(1) prohibits the special master from finding, based solely upon the claims of petitioner, that Bobby's jerking episodes occurred on the evening of his DPT vaccination. According to respondent, Dr. Kinsbourne's testimony that these jerking episodes were seizures "did nothing to substantiate that these episodes occurred."[4] Moreover, respondent asserts that to hold otherwise would vitiate 42 U.S.C. § 300aa–13(a)(1), because it would only "requir[e] ... [a] petitioner[ ][to] visit a physician or medical expert during the course of litigation and have all previously undocumented factual assertions memorialized as a history."[5] Respondent acknowledges that 42 U.S.C. § 300aa–13(b)(2) recognizes that the onset of neurological diseases may be inaccurately recorded, but argues that this section, when read with 42 U.S.C. § 300aa–13(a)(1), prohibits any finding of a first symptom based upon the claims of petitioner alone. Conversely, petitioner contends that Dr. Kinsbourne's testimony substantiates her claims as required by the Vaccine Act. Petitioner asserts that 42 U.S.C. § 300aa–13(a)(1) "only

3. The Court of Federal Claims is split on the issue of *de novo* review of the special master's legal conclusions. *Compare McCarren v. Secretary of DHHS*, 40 Fed.Cl. 142, 146 (1997) (rejecting the *de novo* standard of review and holding the proper standard of review of issues of statutory construction is deference to the determination of the special master) *with Carraggio v. Sec-*

*retary of DHHS*, 38 Fed.Cl. 211, 217 (1997) ("the Court reviews questions of statutory interpretation [under the Vaccine Act] *de novo*.").

4. Resp.'s Mem. at 10.

5. *Id.* at 8.

precludes a special master from making a table [-]injury finding for a petitioner where no medical records are submitted and no expert medical testimony is proffered." [6]

■ The court must resolve this issue by statutory interpretation.[7] The court's inquiry begins with the language of the statute. *Fanning v. Secretary of Veteran's Affairs,* 160 F.3d 717, 721–22 (Fed.Cir.1998) (citing *Bailey v. United States,* 516 U.S. 137, 144, 116 S.Ct. 501, 506, 133 L.Ed.2d 472 (1995)). The court must examine "its language to determine whether Congress has directly spoken to the precise question at issue." *Vesser v. Office of Personnel Management,* 29 F.3d 600, 604 (Fed.Cir.1994). "If the intent of Congress is clear, that is the end of the matter because [the court] must give effect to the unambiguously expressed intent of Congress." *Id.* The court must consider "not only the bare meaning of the word[s] but also [their] placement and purpose in the statutory scheme." *Id.* (citing *Bailey,* 516 U.S. at 145, 116 S.Ct. at 506). Where the plain meaning of the statute produces an unreasonable result "plainly at variance with the policy of the legislation as a whole," the Supreme Court has followed the purpose, rather than the literal words. *United States v. Am. Trucking Ass'ns,* 310 U.S. 534, 543, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345 (1940). A statute must be interpreted as a whole, *Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 591–92, 7 L.Ed.2d 492 (1962), and the court should construe the statute to give effect and meaning to all of its terms. *Sterling Fed. Sys., Inc. v. Goldin,* 16 F.3d 1177, 1185 (Fed.Cir.1994). Moreover, the court should attempt "not to interpret a provision such that it renders other provisions of the same statute inconsistent, meaningless, or superfluous." *Great Northern Nekoosa*

*Corp. v. United States,* 38 Fed.Cl. 645, 657 (1997).

■ With regard to the special master's power to grant compensation, the Vaccine Act provides:

(A) General rule

(1) Compensation shall be awarded under the Program to a petitioner if the special master or court finds on the record as a whole—

(A) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa–11(c)(1) of this title, and

(B) that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition.

The special master or court may not make such a finding based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion.

42 U.S.C. § 300aa–13(a). The Vaccine Act further provides:

(b) Matters to be considered

. . . .

(2) The special master or court may find the first symptom or manifestation of onset or significant aggravation of an injury, disability, illness, condition, or death described in a petition occurred within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period. Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset or significant aggravation of the inju-

---

6. Petitioner's Response to Respondent's Motion for Review and Memorandum of Objections (Pet.'s Mem.) at 8.

7. The Court of Federal Claims has reached different conclusions on this issue. *Compare Buxkemper v. Secretary of DHHS,* 32 Fed.Cl. 213, 220 (1994) (finding a special master's determination that the residual seizure disorder occurred within three days of a DPT vaccination arbitrary and capricious, because the medical opinions sup-

porting petitioner's claims were based solely upon petitioner's claims, and not based on any contemporaneous medical records or opinions of treating doctors) *with Johnston v. Secretary of DHHS,* 22 Cl.Ct. 75, 77 (1990) (finding petitioner could recover despite the fact that only family members could place the necessary symptoms within the required three-day period and medical records were entirely silent with regard to the alleged injury).

ry, disability, illness, condition, or death described in the petition did in fact occur within the time period described in the Vaccine Injury Table.

42 U.S.C. § 300aa–13(b)(2).

Examining the plain language of the statute, it is clear that 42 U.S.C. §§ 300aa–13(a)(1) and 300aa–13(b)(2) have different purposes. As the court previously held: "[§ ] 300aa–13(a)(1) is a general admonition. It is an effort to weed out claims which have no medical basis to support the injury. But the language in [§ ] 300aa–13(b)(2) affects only one issue: when did the first symptom occur?" *Johnston,* 22 Cl.Ct. at 78; *accord Raley v. Secretary of DHHS,* 1998 WL 681467, *10 ("[42 U.S.C. § 300aa–]13(b)(2) applies only to the finding that the onset of the injury occurred within the Table time frame"). Section 300aa–13(a)(1) applies to the issue of whether a vaccine-related injury occurred and to the special master's ultimate decision to grant compensation. As mentioned, that section requires a petitioner to establish by a preponderance of the evidence the requirements found within 42 U.S.C. § 300aa–11(c)(1). Specifically, one of the requirements in 42 U.S.C. § 300aa–11(c)(1) is that a petitioner allege that the injured person sustained a vaccine-related injury and that the first symptom occurred within the time listed in the Vaccine Injury Table (table time period). *See* 42 U.S.C. § 300aa–11(c)(1)(C)(i).

Section 300aa–13(b)(2) further defines 42 U.S.C. § 300aa–11(c)(1)(C)(i) regarding a special master's finding that petitioner establish the occurrence of the first symptom. Section 300aa–13(b)(2) grants the special master discretion to find that the first symptom occurred within the table time period, even though the first symptom is not recorded in the injured person's medical records. 42 U.S.C. § 300aa–13(b)(2). This section only permits the special master to make such a finding if the petitioner demonstrates, by a preponderance of the evidence, that the first symptom occurred within the table time period. *Id.* In order to conclude that the first symptom occurred within the table time period, the special master must weigh evidence

that supports a petitioner's claim against other evidence in the record.

Section 300aa–13(b)(2) does not grant the special master the same discretion to find that a vaccine-related injury occurred or award compensation. Rather, such findings may not be made "based upon the claims of petitioner alone, unsubstantiated by medical records or medical opinion." 42 U.S.C. § 300aa–13(a)(1). Reading 42 U.S.C. §§ 300aa–13(b)(2) and 300aa–13(a)(1) together, the court finds that the special master's discretion to determine that the first symptom occurred within the table time period is not limited by the substantiation requirement in 42 U.S.C. § 300aa–13(a)(1). Therefore, respondent's assertion that 42 U.S.C. § 300aa–13(a)(1) requires independent medical opinion or medical testimony to substantiate a petitioner's claim that the first symptom occurred within the table time period is misplaced. Neither 42 U.S.C. § 300aa–13(a)(1) nor 42 U.S.C. § 300aa–13(b)(2) contain that requirement. Moreover, such a requirement would conflict with the purpose of the Vaccine Act, which is to compensate victims of vaccine-related injuries or deaths "quickly, easily, and with certainty and generosity." *Staples v. Secretary of DHHS,* 30 Fed.Cl. 348, 355 (1994) (citing *McClendon,* 23 Cl.Ct. at 194).

In the case at bar, the special master found petitioner's testimony was more credible than Bobby's medical records, and concluded that Bobby experienced jerking episodes on the evening of his first DPT vaccination. The special master then concluded, based upon Dr. Kinsbourne's testimony, that the jerking episodes Bobby experienced were seizures. Accordingly, the court finds that, based upon 42 U.S.C. § 300aa–13(b)(2), the special master did not err as a matter of law in finding Bobby experienced his seizures within three days of his vaccination.

Respondent next argues that the special master's decision was arbitrary and capricious because he rejected contemporaneous medical records and accepted petitioner's testimony, to conclude that Bobby experienced jerking episodes on the evening of his DPT vaccination. Respondent also argues

that the special master failed to address a number of issues critical to his determination. Petitioner asserts that the special master adequately considered all the relevant evidence in the record, and this evidence clearly supports the special master's decision. In addition, petitioner claims that the special master rejected respondent's argument that petitioner confused the events that occurred on the dates of Bobby's three DPT vaccinations.

As discussed above, the Vaccine Act permits the special master to find that the first symptom or manifestation of injury occurred, even though it was not recorded in the medical records. 42 U.S.C. § 300aa–13(b)(2). The special master must determine by a preponderance of the evidence that the first symptom occurred. *Id.* Accordingly, the court must determine whether the special master correctly determined that, based upon the evidence before him, it was more likely than not that Bobby's jerking episodes began on January 28, 1950.

The special master stated that he reviewed the record as a whole. In addition, the special master stated that he found petitioner's testimony to be convincing.[8] The special master also found that "Mrs. Camery offered a very credible explanation for the absence in Bobby's medical records of any reference to jerking episodes that occurred before February 14, 1950: [s]he was 'obsessed with' the severity of the episode that occurred at her mother's birthday celebration on February 14, 1950." *Camery,* No.90–2585V, at 12. Although acknowledging the contradiction between petitioner's testimony and the medical records, the special master stated:

> [I]n weighing Bobby's medical records against Mrs. Camery's testimony, the special master adheres to the admonition that:
>
>> the absence of a reference [in the medical records] to a condition or circumstance is much less significant than a reference which negates the existence of

a condition or circumstance. Since medical records typically record only a fraction of all that occurs, the fact that reference to an event is omitted from the medical records may not be very significant.

*Id.* at 11–12 (citing *Murphy v. Secretary of DHHS,* No. 90–0882V, 1991 WL 74931, *4 (Cl.Ct. Apr. 25, 1991), *aff'd,* 23 Cl.Ct. 726 (1991), *aff'd per curiam,* 968 F.2d 1226 (Fed. Cir.1992), *cert. denied sub nom. Murphy v. Sullivan,* 506 U.S. 974, 113 S.Ct. 463, 121 L.Ed.2d 371 (1992)). The special master then concluded that "based upon [petitioner's] credible testimony, the special master finds that there is a preponderance of the evidence that Bobby exhibited jerking episodes within three days after he received a DPT vaccination on January 28, 1950." *Id.* at 13.

It is well settled that "[t]he fact-finder has broad discretion in determining credibility because he saw the witnesses and heard the testimony." *Bradley,* 991 F.2d at 1575. Moreover, "such credibility determinations are virtually unreviewable." *Id.* In contrast, consistent medical records are given weight over conflicting testimony offered after the fact. *Murphy,* 1991 WL 74931, *4; *accord Cucuras v. Secretary of DHHS,* 993 F.2d 1525, 1528 (Fed.Cir.1993) ("oral testimony in conflict with contemporaneous documentary evidence deserves little weight") (citing *United States v. United States Gypsum Co.,* 333 U.S. 364, 396, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). When faced with this issue, the United States Court of Appeals for the Federal Circuit stated:

> [m]edical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events.

---

8. The special master noted:

Mrs. Camery was a particularly powerful witness. She appeared forthright and adamant in her recitation of events. Indeed, Mrs. Camery's story did not appear to the special master to be contrived or to be embellished for pur-

poses of litigation. With her forceful declaration that she knew "what happened to [her] baby," ... Mrs. Camery persuaded utterly the special master about the veracity of her narrative.

*Camery,* No. 90–2585V, at 12.

*Cucuras,* 993 F.2d at 1528. This rule, however, should not be applied inflexibly, because medical records may be incomplete or inaccurate. *Murphy,* 1991 WL 74931, at *4. In fact, "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Id.* Oral testimony that is inconsistent with medical records must be consistent, clear, cogent and compelling to outweigh medical records prepared for the purpose of diagnosis and treatment. *Blustein v. Secretary of DHHS,* No. 90–2808V, 1998 WL 408611, *5 (Fed.Cl.Spec.Mstr. June 30, 1998).

In the case at bar, the special master determined that petitioner's testimony deserved more weight than the medical records. The special master relied upon *Skidmore v. Secretary of DHHS,* No. 89–1003V, 1990 WL 299395 (Cl.Ct.Spec.Mstr. Aug. 20, 1990), in which the special master held that consistent, cogent and credible oral testimony could overcome missing or contradictory medical records. Although in the case at bar the special master applied this standard to find petitioner's testimony was more credible, he did not address specific contradictions contained in petitioner's testimony. For example, in her 1990 and 1993 affidavits, petitioner did not attest that any jerking episodes occurred on the evening of Bobby's first DPT vaccination. Yet in her third affidavit, petitioner attested that Bobby experienced jerking episodes the evening of his first vaccination. In light of the standard used by the special master, it was incumbent upon him to address these inconsistencies.

Moreover, the special master acknowledged that petitioner's testimony contradicted Bobby's medical records. Nevertheless, the special master determined that the absence of any references to seizure-like symptoms occurring before February 14, 1950, in the medical records was not significant. It is unclear to the court from the special master's decision whether the special master considered the inconsistencies in petitioner's three affidavits, as well as the contradictions between her first two affidavits and subsequent testimony at the evidentiary hearing. Because the special master's determination required him to assess petitioner's credibility,

the court finds that the special master should have addressed these inconsistencies.

Further, the special master found very credible *petitioner's* explanation for the absence in Bobby's medical records of any reference to jerking episodes having occurred prior to February 14, 1950 was due to her obsession with the seizure that occurred on that date. The special master then determined a "fair interpretation of Bobby's medical records supports Mrs. Camery's explanation." *Camery,* No. 90–2585V, at 12. In support of his conclusion, the special master noted that the medical records provided that "Bobby's episodes increased dramatically after February 14, 1950." *Id.* As respondent correctly points out, however, this obsession with Bobby's seizure that occurred on February 14, 1950, would not explain why, in drafting her 1990 and 1993 affidavits, petitioner did not recall any seizure-like symptoms occurring before February 14, 1950. The court finds that the special master should have addressed this issue.

### Conclusion

For the above stated reasons, this case is remanded to the special master to address the inconsistencies between petitioner's three affidavits, as well as the contradictions between petitioner's 1990 and 1993 affidavits and her testimony at the evidentiary hearing. The special master shall issue further findings of fact and draw conclusions of law in accordance with this opinion.

IT IS SO ORDERED.