# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

* * * * * * * * * * * * * * * * * * * *

ARTHUR CLINE,                    *
                                 *      No. 10-596V
                Petitioner,      *      Special Master Christian J. Moran
                                 *
v.                               *
                                 *      Filed: February 25, 2013
SECRETARY OF HEALTH              *
AND HUMAN SERVICES,              *
                                 *      UNPUBLISHED
                Respondent.      *
* * * * * * * * * * * * * * * * * * * *

Isaiah Kalinowski, Maglio, Christopher & Toale, PA, Sarasota, FL, for petitioner;
Jennifer Reynaud, United States Dep't of Justice, Washington, DC, for respondent.

## RULING RESOLVING DISPUTED ISSUES OF FACTS[*]

      Arthur Cline alleges that an October 14, 2009 flu vaccine caused him to
suffer a neurologic problem known as Guillain-Barré syndrome. He seeks
compensation through the National Childhood Vaccine Injury Compensation
Program.

      Guillain-Barré syndrome typically manifests as a "rapidly ascending motor
neuron paralysis. . . . It begins with paresthesias of the feet, followed by flaccid
paralysis of the entire lower limbs." Dorland's Illustrated Medical Dictionary
1832 (32d ed.). Mr. Cline's doctors have diagnosed him as suffering from
Guillain-Barré syndrome and the Secretary has not challenged the accuracy of that
diagnosis. See Resp't Rep't, filed August 2, 2011.

---

[*] The E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17,
2002), requires that the Court post this decision on its website. Pursuant to Vaccine Rule 18(b),
the parties have 14 days to file a motion proposing redaction of medical information or other
information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special
master will appear in the document posted on the website.

Although the diagnosis is not disputed, the parties disagree when Mr. Cline started to experience the symptoms typically associated with Guillain-Barré syndrome. The Secretary argues that Mr. Cline started having problems on December 26, 2009, which is more than two months after his flu vaccination. The Secretary's position is based upon medical records created at or near the time Mr. Cline was hospitalized for his Guillain-Barré syndrome. In contrast, Mr. Cline maintains that he started having pain, tingling, and numbness no later than November 30, 2009, based upon various affidavits. See, e.g., Exhibit 16.

To obtain additional testimony from the affiants, a hearing was held on May 21, 2012. The witnesses were located in Traverse City, Michigan, and appeared via videoconferencing as permitted by Vaccine Rule 8(b)(2). Mr. Cline was the primary witness. He also called Joshua Cline (his son), Dan Mendenhall (a friend), Judy Krimmel (a co-worker), and Glen Gillepsie (a co-worker).

The parties submitted, on November 27, 2012, a joint statement regarding the questions of fact. With this submission, the matter is ready for adjudication.

## Standards for Finding Facts

Petitioners are required to establish their cases by a preponderance of the evidence. 42 U.S.C. § 300aa–13(1)(a). The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." Moberly v. Sec'y of Health & Human Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The process for finding facts in the Vaccine Program begins with analyzing the medical records, which are required to be filed with the petition. 42 U.S.C. § 300aa–11(c)(2). Medical records that are created contemporaneously with the events that they describe are presumed to be accurate. Cucuras v. Sec'y of Health & Human Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Not only are medical records presumed to be accurate, they are also presumed to be complete, in the sense that the medical records present all the problems of the patient. Completeness is presumed due to a series of propositions. First, when people are ill, they see a medical professional. Second, when ill people see a doctor, they report all of their problems to the doctor. Third, having heard about the symptoms, the doctor records what he (or she) was told.

The presumption that contemporaneously created medical records are accurate and complete is rebuttable, however. For cases alleging a condition found in the Vaccine Injury Table, special masters may find when a first symptom appeared, despite the lack of a notation in a contemporaneous medical record. 42 U.S.C. § 300aa-13(b)(2). By extension, special masters may engage in similar fact-finding for cases alleging an off-Table injury. In such cases, special masters are expected to consider whether medical records are accurate and complete.

In weighing divergent pieces of evidence, contemporaneous written medical records are usually more significant than oral testimony. Cucuras, 993 F.2d at 1528. However, compelling oral testimony may be more persuasive than written records. Campbell ex rel. Campbell v. Sec'y of Health & Human Servs., 69 Fed. Cl. 775, 779 (Fed. Cl. 2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); Camery v. Sec'y of Health & Human Servs., 42 Fed. Cl. 381, 391 (1998) (this rule "should not be applied inflexibly, because medical records may be incomplete or inaccurate"); Murphy v. Sec'y of Health & Human Servs., 23 Cl. Ct. 726, 733 (1991), aff'd, 968 F.2d 1226 (Fed. Cir. 1992).

The relative strength or weakness of the testimony of a fact witness affects whether this testimony is more probative than medical records. An assessment of a fact witness's credibility usually involves consideration of the person's demeanor while testifying. Andreu v. Sec'y of Health & Human Servs., 569 F.3d 1367, 1379 (Fed. Cir. 2009); Bradley v. Sec'y of Health & Human Servs., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

## General Assessment Of Arguments And Evidence

The recurring theme in the parties' disputes concerns the value of documents created contemporaneously with events they purport to describe. Mr. Cline offers his testimony and the testimony of his associates to describe what happened to him between Thanksgiving and Christmas 2009. During this time, no records were created strictly speaking. However, the records created between December 27, 2009 and January 8, 2010, show that Mr. Cline reported that his weakness, loss of balance, and dizziness began on December 26, 2009. Exhibit 2 at 6, 9, 81, 85. Therefore, the Secretary argues, his weakness could not have started and did not start before December 26, 2009.

3

Although the Secretary's emphasis on contemporaneously created documents is based upon Cucuras, a demand for documents can become excessive. For example, the following is Mr. Cline's proposed finding of fact concerning his hobbies, which included hunting, fishing, and mushrooming:

> Petitioner's recreational activities were predominantly situated in woodlands or on waterways, and required stamina, balance, and dexterity in order to participate safely, and to handle the gear involved in those respective activities. Tr. [] 18-19.

The Secretary's response is:

> Respondent contends that there is an absence of documentation, contemporaneous or otherwise, to support this proposed fact. Moreover, the existence or nonexistence of this proposed fact is not material to petitioner's claim of a vaccine related injury.

Joint Statement at 2, ¶ 6.

The Secretary's first sentence is true—Mr. Cline did not submit any document describing what he did for enjoyment. But, how many adults create daily logs? It cannot be the case that the only "facts" that count in litigation are those events that are memorialized in some written document.

The Secretary's second sentence in her response to the proposed finding of fact—that Mr. Cline's recreational activities are not material—overlooks the context for his assertion. Mr. Cline's basic argument is something like this: "I know that I was having health problems around Thanksgiving 2009. I know this because I enjoy hunting, and in 2009, I did not hunt as often as I would normally." See Tr. 95; cf. Tr. 105 (testimony of Mr. Cline's son that "it was around mid-November, and like I say just because that [is] deer season is why I pick mid-November"), 138 (testimony of Ms. Krimmel that she recalled talking with Mr. Cline who "was wondering whether he was going to be able to go hunting"). Thus, the physical nature of Mr. Cline's activities (as opposed to more sedentary pursuits, like playing poker) gives him a foundation for saying his health started deteriorating in November.

Mr. Cline's account, that in November 2009, he did not hunt as extensively as he would normally, because he was physically incapable of hunting, rang true. Tr. 62-63, 101, 106. The hunting season in Michigan runs from November 15 to

4

November 30. Tr. 20, 104. This event anchors Mr. Cline's recollection and allows him to date the onset of weakness and tingling in his legs persuasively.

The Secretary fairly argues that if Mr. Cline were experiencing weakness in his legs, then he would have sought medical attention. Some people certainly behave this way, and the Secretary might reasonably expect that Mr. Cline would, too. However, Mr. Cline explained that he is someone who does not see doctors often. Tr. 20 (had never received a flu shot), 60-61; see also Tr. 45 (he saw doctors at the end of December 2009 because he "had no choice in the matter"). The records from his doctors corroborate this view. Their treatment records do not include notes of visits for relatively minor concerns. See Exhibit 14 at 55-59. Thus, the absence of any treatment records between his October 14, 2009 vaccination and December 27, 2009, when he went to the emergency room, is neither surprising nor inconsistent with his account.

However, Mr. Cline's version that he started having weakness in November 2009, does not agree with the story he told his treating doctors at the end of December and in early January. On December 27, 2009, Mr. Cline told a doctor that he was having "moderate dizziness for over 24 hours." Exhibit 2 at 9.[1] Later, his January 13, 2010 discharge report states that the weakness, paresthesias, and pain started "after a flu like illness the week before Christmas." Id. at 81. These recitations provide firm support for the Secretary's argument that the weakness, etc., started around December 26, 2009.

At hearing, Mr. Cline explained that the problems he started having right after Christmas were much worse than what he experienced before. Tr. 33-34. Before Christmas, his problems were not "totally devastating," but after Christmas he "was devastated." He could not walk. Tr. 44-45. At a separate portion of the hearing, Mr. Cline testified "everything seemed to go from like a . . . 3 or 4, up to about a 12. . . . And that's where I got devastated. And it scared me. And all I was really concerned about is finding out what I can do, what's going on." Tr. 65. Furthermore, Mr. Cline also explained that although, after Christmas, he had focused on not being able to walk, he realized during his convalescence that he had

---

[1] This record also states that Mr. Cline was having "tingling-type numbness sensation the entire left upper extremity and the right upper extremity from the elbow distal. He states there is decreased sensation but not a total lack thereof. He feels like he is weak in the legs. No significant pain." Exhibit 2 at 9. There is not a specific statement about when the numbness, decreased sensation, and weakness began.

5

numbness and tingling earlier.  Tr. 89-93; <u>see also</u> Tr. 96 (discussing Exhibit 7 at 2).

Mr. Cline's testimony was convincing.  The testimony of the other witnesses (his son, Mr. Mendenhall, Ms. Krimmel, and Mr. Gillepsie) was consistent with his account.  Consequently, the witnesses' oral testimony is generally credited throughout the following section.

## **<u>Specific Findings Of Facts</u>**

### Before Vaccination

1.   At the time of vaccination, Mr. Cline's medical history was significant for high blood pressure, high cholesterol, gastric reflux, hyperlipidemia, and sleep apnea.  Exhibit 2 at 39; Exhibit 14 at 2, 29.

2.   At the time of vaccination, Mr. Cline was taking medication for hypertension every day as prescribed, following a stress test in mid-2009.  Tr. 88.

3.   At the time of vaccination, Mr. Cline had a long-standing history of left hand and distal forearm numbness since 2005, with carpal tunnel syndrome in his left hand, and mild left cubital tunnel syndrome noted on an EMG report on July 11, 2006.  Exhibit 14 at 14.

4.   Mr. Cline's symptoms of carpal tunnel syndrome in 2006 were limited primarily to pain, were asymmetric, and did not strongly affect motor strength and dexterity.  Tr. 26-27.

5.   In 2009, Mr. Cline worked at Alcotec Wire, a company that manufactures aluminum welding wire.  His responsibilities included maintaining and repairing the machinery.  Tr.  11-14.

6.   Mr. Cline's job duties (at the time of vaccination as well as over the several years before) required manual dexterity and strength, physical agility and balance.  Tr. 12-17.

7.   Mr. Cline's recreational activities were hunting, mushrooming, and fishing.  These were predominantly situated in woodlands or on waterways, and required

6

stamina, balance, and dexterity in order to participate safely, and to handle the gear involved in those respective activities.  Tr. 17-19.

## Vaccination

8.   Mr. Cline received the administration of a trivalent influenza vaccination on October 14, 2009, the first he had ever received.  Tr. 20.

## Health from November 15, 2009 through January 8, 2010

9.   Just after November 15th, but no later than November 30th (Michigan's hunting season), Mr. Cline started to experience lower extremity pain, cold sensation, clumsiness, and loss of stamina.  Tr. 20-21.

10. Mr. Cline attributed the pain in his feet to the time he spent standing on concrete at work.  Exhibit 16 at 1; Tr. 21.

11. The onset of these lower extremity symptoms was accompanied by, or shortly followed by, a loss of manual dexterity, which eventually began to affect Mr. Cline's ability to perform his usual tasks at work.  This symptom pattern is best illustrated by him dropping items – first heavier items like the gated machinery safety guards, but eventually lighter items like wrenches and other tools – if he was not focused upon holding them tightly.  Exhibit 18 at 1; Tr. 23. These symptoms in his upper extremity began in late November, near Thanksgiving.  Tr. 72, 107-08, 116 (December), 118-19 (losing strength).

12. As Mr. Cline's condition progressed, he began tripping over obstacles, because he was not picking his feet up enough when he walked, a pattern caused by his progressive lower extremity weakness and numbness.  Tr. 24, 28-29, 101, 129.

13.  Mr. Cline did not visit a doctor regarding these symptoms during the period of mid-November through mid-December because he was able to continue to work, even though his co-workers had to accommodate the disabilities caused by these symptoms by performing the work tasks that Mr. Cline could not accomplish due to his symptoms.  Tr. 31-33.

14. Mr. Cline began having to rely upon co-workers to perform maintenance tasks that required climbing ladders and climbing on top of factory equipment, for example. Tr. 23-24; see also Tr. 133-34, 143-44.

15. Once Mr. Cline's weakness and clumsiness started in November 2009, the weakness and clumsiness either remained constant or became more frequent. Tr. 33, 107-08, 131-32.

16. Approximately one week before Christmas in 2009, Mr. Cline experienced symptoms of sore throat, coughing, slight fever, myalgias, runny nose and malaise. These symptoms persisted for about a week and slowly resolved. Exhibit 16 at 1-2; Exhibit 2 at 85; Tr. 29-30.[2]

17. Mr. Cline awoke the morning of December 26, 2009, to find that his leg strength had diminished considerably, such that he nearly fell on his face. Tr. 33-34, 36. He needed assistance to walk at that point. He waited one day to see if the symptoms would pass, but was immobilized that whole day. Exhibit 1 at 2, 4; Exhibit 2 at 6, 85; Exhibit 9 at 3, 9-12; Tr. 33-34.

18. The next day, December 27, 2009, Mr. Cline went for examination and treatment, first to an urgent care clinic in the Munson Medical System, and then to the emergency room (ER) at Munson Medical Center, during which time Mr. Cline was evaluated primarily for cardiologic conditions. Exhibit 1 at 2, 4; Exhibit 2 at 6; Exhibit 9 at 9-12; Tr. 34-35.

19. In addition to tingling and numbness in his arms and weakness in his legs, beginning on December 26, 2009, Mr. Cline experienced unsteadiness or a loss of balance. Exhibit 2 at 9, 250; Tr. 43.

20. On Monday, December 28, 2009, Mr. Cline was seen at the office of Dr. Bannow, who noted the numbness in Mr. Cline's extremities, but who merely provided Mr. Cline with medication for sinus infection, and did not otherwise treat Mr. Cline's complained-of symptoms. Exhibit 14 at 50; Tr. 36-37, 64-66.

21. Mr. Cline started having back pain after he went to the ER. Tr. 71.

---

[2] Although Mr. Cline described himself as having the "flu," he "call[s] everything the flu." Tr. 30.

22. On January 2, 2010, Mr. Cline went for a second opinion to another urgent care facility, where he was examined by Dr. Pierre Springsteen. At this point, Mr. Cline could walk only with great difficulty. Exhibit 9 at 3; Tr. 38.

23. Mr. Cline returned to Dr. Bannow on January 7, 2010. Tr. 39-40. The following day, on January 8, 2010, Mr. Cline saw Dr. Springsteen. Exhibit 1 at 2. Mr. Cline continued to have symptoms of arm and leg pain, paresthesia, and ataxia, causing Dr. Springsteen to send Mr. Cline to the ER, as he suspected a possible GBS variant. Id.

## Conclusion

The parties are ordered to provide this ruling to any expert they retain. If the expert's opinion is not consistent with these findings of fact, the opinion is likely to not be persuasive. See Burns v. Sec'y of Health & Human Servs., 3 F.3d 415, 417 (1993) (holding that the special master did not abuse his discretion in refraining from conducting a hearing when the petitioner's expert "based his opinion on facts not substantiated by the record").

A status conference is set for **Wednesday, March 6, 2013 at 10:00 A.M. Eastern Time**. The Office of Special Masters will initiate the call.

**IT IS SO ORDERED.**

s/Christian J. Moran
Christian J. Moran
Special Master